Peck, Judge.
On the 25th March, 1822, there issued from the office of the circuit court of Lincoln count), a capias ad respondendum, at the suit of John Waddel, against the Fayetteville Tennessee Bank, to answer the plaintiff in a plea of trespass on the case, to his damage $3,000. The sheriff made the following return thereon: “executed, having summoned .Vance Greer as President, and William Dickson as Cashier of said bank.”
The suit was instituted to recover the amount due upon a number of notes issued by the said bank. The declaration was in common form, with the usual averment, that the same had been presented for payment, and payment refused. The bank appeared to the action and pleaded non assumpsit; on which plea issue was joined.
At March term, L823, a jiry passed upon the issue, and rendered a verdict m favor of the plaintiff, for $1GG3; and (he court thereon gave judgment. Upon this judgment an cx.'cul.on issued returnable to the subsequent term of said court; on which the sheriff returned, “no property found in my county to satisfy this execution.” The record then recites, that when the capias ad *261 respondendem issued, there also issued a summons, made known by delivering a copy to Jacob Yanzanl, calling upon him to appear on the 3d Monday in Sept. 1822, (the day on which the writ was returnable,) and then and there answer on oath, as garnishee, what debts he owed said bank. He appeared to the said summons, and by consent of parties, his examination was postponed until the 24th September, 1822, when an examination on oath was had, and wherein he stated in substance, that about the time the bank went into operation, he bought twenty shares of stock, which had been subscribed by Boyles and Quistenbury, and which stock was transferred to him on the books of the bank. In 1819, he bought 25 shares more, which also, was transferred to him; on which shares he had paid $1125, and which sum the bank was indebted to him for so much paid on stock. That he had borrowed from the bank at different times, about fifteen hundred dollars, which sum he had reduced by sundry payments. That on the first of April, 1822, he had a settlement with the bank, and the balance of his debt at that time, over and above the $1125, the amount of his stock paid in, was $235, and this sum he paid by a deposit of the notes of said bank, to that amount. That with the consent and approbation of the President and two directors present, and under an order of the board of directors, made the 17th March, 1822, authorizing it, he transferred the shares by him held, to said bank, in full for his debt of $1125, and thereby divested himself of all interest in said forty-five shares; and that this was all done before the garnishment. He further stated, that his note which had been renewed in bank from lime to time, until said settlement, had been always made payable in the notes of said bank, agreeable to the order of the board; and that that was the kind of money he had drawn from said bank. That the notes of the bank were not worth more than 33* cents in the dollar, in specie; and he. submitted, whether by the constitution and laws of the State, any judgment can be rendered against him on these proceedings. The orders *262 authorizing the notes of the bank to be taken payable in ^ paper 0f t]le bank, and that debtors might transfer their stock to the bank, were appended to the answer of the said Yanzant. The last order does not express in terms, though it may be implied, that stock might be transferred in payment of debts.
On the above proceedings, judgment was rendered against the said Yanzant, for $>1,125. He prosecuted an appeal in the nature of a writ of error to the supreme court, where the judgment was reversed, and the cause remanded with these special directions: that a jury should be empannelled to ascertain the specie value of the notes of the said bank, at the time Vanzant’s note became due; also, if said note was made, payable in said notes, with a view to defraud the note holders or creditors of said bank; and likewise to inquire if the settlement of the said Vanzant with the bank, was madebona fide, with a view to secure a debt due by said Yanzant to the bank; and on such finding, to give judgment. On these issues, the jury found; 1st, that the notes of said bank, at the time Vanzant’s note became due, were worth 25 cents in the dollar, in specie; 2d, that the note given as above mentioned by Yanzant, was a fraud against the note holders and creditors of the bank; and 3d, that the settlement made by said Yanzant, was not done to secure the bank, neither was it done bona fide. On this finding, on motion, the court gave judgment for $1125, against Yanzant, from which he prosecuted a writ of error to this court.
There is a bill of exceptions to the admission of testimony, which not being seriously insisted on in argument, is not necessary to be noticed.
The legislature passed an act on the 15th of Nov. 1821, entitled, an act prescribing the mode by which the holders of the notes of the Farmers’ and. Mechanics’ Bank, at Nashville, and the Fayetteville Tennessee Bank, may, on their refusal to pay the same, recover judgment. This act, it is said, has given rise to the proceedings in this case against Vanzant. And it is insis *263 ted, that by its provisions the charter of the hank has , , , , , , „ , been violated; that said act is m violation of the constitution of the state, is partial, unequal and oppressive in its operation; and that it isa private act, which not appearing on the record, the court is not bound to notice it.
The act provides, in substance, that when payment of the notes of said bank has been refused, if under ‡ 100, warrants may issue from under the hand of some justice of the peace, against such bank, and after the demand and refusal to pay at said bank, judgment may be entered up, and execution may be issued as in other cases. That if the execution cannot be satisfied out of funds of the institution, then the officer having such execution, may summon persons supposed to be indebted to said bank, who shall on oath, declare what they owe said bank, &c. The act further provides, that when a writ issues and is served upon the officers of such bank, the party may have his election, either on original or mesne process, to summon persons as garnishees to answer on oath, what they are indebted to said bank, &c. and on the return of such summons with the writ, and after examination of such garnishee, “if he shall declare that he is indebted to such bank in notes of said bank or banks, then the court may empannel a jury to ascertain the value of such notes, and to inquire if the note so taken and made payable in the notes of such bank, was done with a view to defraud the note holders of such bank. If done with such view, the court to give judgment for the amount specified in such note; if otherwise, for such value of the notes of said bank, as may be found by the jury.”
No new process is given by this act, unless it be that of a summon for a garnishee at the time of serving the original writ, or capias ad respondendum. Was it competent for the Legislature, consistent with the constitution of the state of Tennessee, to give this summons as a cumulative remedy to those other remedies which existed at the time the law passed? To admit the principle that such a law cannot be passed by the Legislature, would be *264 at once to strike at the root of all those statutes providing summary remedies against shenUs, coroners* and consla-bles, delinquent at the time of the passage of the law; a]s0 against those providing a remedy for securities who have paid the debt of their principal. In short, it would be to admit that an existing contract could not be reached if a change in the remedy were to take place, so as to alter the form of the process after such contract had been made. Who ever pretended that the act increasing the jurisdiction of justices of the peace from twenty to fifty dollars, and afterwards from fifty to one hundred dollars, were unconstitutional, because the tribunal and process was changed during the existence of the debt? It was indeed urged, and with some plausibility, that they were unconstitutional, because it gave the plaintiff a summary mode of proceeding, and that too without an intervening jury trial, and that the election of a plaintiff to sue before a justice, placed the party defendant in such a situation, that he could not have a trial by jury without giving security for the, debt, whereas the law as it stood before, gave him a jury trial on appearance bail only.— These, though strongly urged to the supreme court as constitutional objections, were overruled on the ground that the right of trial by jury was not by those acts taken away, even in cases growing out of acts of Assembly where summary proceedings were given, and where the passing of a jury upon matters of fact seem to have been overlooked; still the courts in doing a defendant justice under these acts, will empannel a jury and submit issues; this has been done on motion against sheriffs and other officers, under some of those acts authorizing the court to give judgment on motion. So in proceedings in caveat cases, a jury has to pass upon the facts, unless the case he agreed. Cases growing out of these acts go to show (that it does not follow, that the ancient right of trial by jury is taken away, because the pleadings and issues are not submitted in common law form. This act of Assembly, then, so far as considered, does not violate the constitution; it does not give to any court an arbitrary power *265 io seize the estate of the hank, or of the debtor to the hank, and dispose of it without giving the parties a day in court, and the means of contesting before a jury all such facts as may be necessary to the attainment of justice. The determination made upon this cause ata former term, proves the correctness of the inferences above drawn; then, the court considered the spirit of the act not complied with, when the court took upon itself to determine the fact of fraud in Vanzant giving his»note to the hank payable in notes of the bank; and we then remanded the cause, that such fact might he submitted with others to a jury.
The counsel who argued so strenuously that the provisions contained in the charter of the bank are encroached upon by the act of 1821, and that the act in question is an edict upon certain individuals, seem to forget that the bank, and all called upon to answer under said act, have their day in court allowed them; that they have a right to he heard in defence; and that no one shall be held liable for the debt demanded, until a jury has passed upon it.
Before I quit this branch of the case, it is proper to remark, that a distinction must be drawn between those acts of the Legislature, which come in aid of a remedy and such acts as impose clogs and restrictions upon remedies existing at the time the contract was made. Had the Legislature said that the bank should not have process for the collection of her debts, or that the courts should not be open to the complaints of the bank, the case would be wholly different from this, where all that is attempted is to provide for such defects in the existing remedies as the bank had laid hold of, to evade the payment of her notes.
In answer to the objection, that the act of 1821 is unequal and oppressive, it is only necessary to say, that by a summons served upon a garnishee, the bank is placed in no worse situation than a private individual whose debtor has been garnisheed. The bank, it is true, cannot collect such debt as may be suspended by the garnish *266 ment. But the law has thought it wise, to operate upon so much of the demands of the institution, as to compel her to act honestly; and who will say it is unjust, when other garnishments between natural persons have a like effect? If other banks are not included in the law, it is because no necessity for it existed.
The next objection will now be considered. It is said’ that this is a private and not a public act, and that it not appearing upon the record, cannot be noticed.
The two banks spoken of are both public institutions of the country. Their charters are public laws. This act of 1821, is made in relation to two public institutions of the state. It is an act for the benefit of all such as have had dealings with the paper of such public institutions. Who it may be asked,have had any dealings with, or have held the paper of these banks? I answer, every man in the community; for, where it is possible from the nature of the thing transacted, that one man as well as another has participated in that which is lawful, it is as fair to infer, that all have, as that it was confined to but few. The charter of these banks contemplated a general circulation of their notes; and we are authorized to presume from the record before us, that the circulation had been general and extensive, inasmuch as the capital stock of these banks amounted' to about $>600,000, and that notes to double that amount could be issued. And are we to pre. sume, that the banks have issued less than the amount authorized by the charter, when we find the affairs of the institutions so embarrassed that the small sum demanded in this action could not be paid by one of them?
An act of assembly providing a remedy for the collection of debts, or an act for the relief of securities, would be public acts, not because every man in the community was a debtor or security, but because every man by possibility might be such, or have something to do with such persons. While the act in question relates to these banks on the one side, it relates to all the community on the other, and is not tobe considered a private act, because of the importance or unimportance of the institutions.
*267 The new stale bank is a public institution: her notes, like the notes of those before mentioned,pass every where, or, it is possible, they may so pass. That bank in collecting her debts has a mode prescribed, which is summary'in the manner of obtaining judgments for debts due her. On such motions would it be deemed indispensable for the bank in every case to introduce upon the record a copy of the charter? Certainly not. That bank is not more a public institution, than the banks in question. The time of passing a law cannot make it either a private or a public law: all will agree, had the provisions contained in the act of 1821, been incorporated in the charter, they would have been deemed the provisions of a public law.
In short, these banks being corporations, which all manner of persons might have some transaction with or demand against, it follows, that the act was made for all persons, and is therefore a general law. See Mr. Chitty’s note, I Blac. Com. 86.
I will now briefly notice two authorities introduced and mainly relied upon by the plaintiff in error.
The first is the case of Dartmouth College vs. Woodward, (4 Wheaton’s Rep. 518.
• The questions in that case were certainly not like the present. Dartmouth College was, by charter, founded in New Hampshire, in 1769, before the revolution. It was a charitable institution; had visiters, and perpetuity under its charter. While in operation, and carrying into effect the objects of the founder, the Legislature, without the consent of the corporation, passed a law altering in material respects the terms of the charter. This law was held to be unconstitutional, because it impaired the obligation of the contract, (the charter being considered a contract.)
How is it possible to make the present case fall within the principle of that case?' I can See no possible analogy; but as it seems to me, that case is an authority which, to some extent, may be applied in aid of our present argument.
*268 The charier of Dartmouth College was not dissolved , ° by the revolution, A radical and entire change took place in the administration of justice between the corporation and individuals litigating with it. New forums were established, and new writs framed. I ask where is it intimated,that these changes so affected the corporation that' it could not be reached by the new remedies and process introduced by the change? So far from it, the corporation is proud to acknowlege the power to change the forum, and frame new writs; and in virtue of them, is enabled to retain her political existence.
All the power contended for in this case is conceded in that one, to wit: that it does not violate the charter while in operation, to change the remedy against it, so long as the right of trial by jury remains inviolate.
The other case is cited from 11 Mas. Rep. 396. The only question in the case was, whether when a demand had been barred under an existing law of the Legislature, it was competent for the Legislature to declare, that the act as to that case, should be suspended,and the party denied a privilege which had already accrued to him. It is only necessary to say, that the case is wholy different from the one before the court. That was an act marking, as it were, its victim. It operated between A and B, and the court could not be indifferent to so unequal a conflict. There the Legislature judicially took side with one of the parties. The law went to the merits of a case, and attempted judicially to settle, perhaps, the only point in it. Not so under the act we are considering; no point is settled by the act, so far as we are called upon to view it; but the mode alone by which the party is called into court, that all points may be settled, is complained of. When questions may arise upon other parts of the law in question, they will be decided; it is enough to say at present, that it is not an infringement of the constitution to come in aid of a remedy, and that a contract is not impaired by a law which is made to enforce it: for we are as well to consider the contract the plain *269 tiff below had with the hank, as to consider the contract with the State created by the charter.
A law which is partial in its operation, intended to af-feet particular individuals alone, or to deprive them of the benefit of the general laws, is unwarranted by the constitution, and is void; but that this is such a law, is in my judgment, wholly a mistake. I am therefore of opinion that the judgment ought to be affirmed.
Catron, Judge.
The act of 1821, ch. 197, provides how the creditors of the Fayetteville, and Farmers’ and Mechanics’ Banks, may recover their debts. The first eight sections apply to proceedings before Justices of the Peace. The 9th section authorizes any one indebted to the Bank to be summond as a garnishee before a court of record, to be proceeded against as on final processpn other cases. The garnishee may be summoned, either at the time the original writ issues, or upon the execution against the Bank. In either case, the examination is to be taken at the return of the writ, upon which he was summoned; yet judgment cannot be rendered against the garnishee, at a different time, or in any other manner, than in an ordinary case, by the act of 1811, ch. 89; that is, after judgment and execution against the Bank, and this returned, “no property found.” This course was 'strictly pursued in the present instance, and differs in nothing from a proceeding under the act of 1811, save that the summons issued was served, and the garnishee answered, before final judgment against the Bank.
The question presented by the record is, has the Legislature power to direct the mode by which members of a particular corporate body, may be notified to appear before the ordinary tribunals of the country, to be proceeded against according to the public and general laws of the land?
That a partial law, tending directly or indirectly to deprive a corporation or an individual of rights to property, or to the equal benefits of the general and public laws of the land, is unconstitutional and void, we do not *270 doubt. Our entire approbation is accorded to the decisions cited in the causes of Dartmouth College vs. Woodward, (4 Whea. R. 518,) and Holden vs. James, (11 Mass. R. 396. Our constitution, art. 11, sec. 8, declares, “That no free man shall be deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land.” The clause “law op the land,” means a general and public law, equally binding upon every member of the community. Our Colonial history will best teach its meaning. Our ancestors were taught it by being transported across the Atlantic for trial; by the Boston port-bill, and other British Legislation. A careful examination of Marshall’s history of the Colonies, particularly the 13th and 14th chapters, and of Smollett’s and Bissett’s history of England, especially vol. 1, ch. 12, of the latter, will greatly tend, it is apprehended, to change the opinion of the counsel of the plaintiff, who contended in argument, that this term had no definite meaning; at least not the one here ascribed to it; and that it answered no useful purpose in the constitution. Notwithstanding the provision,is it to be supposed the Legislature, equally with the Governments of France, Russia or Turkey, is sovereign in this respect, even retaining the powers of individual proscription extending to banishment, as well as power to legislate partially in reference to particular individuals, affecting their rights by partial and extraordinary remedies.
The right to life, liberty and property, of every individual, must stand or fall by the same rule [or law that governs every other member of the body politic, or “lane,” under similar circumstances; and every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to-similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies, would be governed by one rule, and the mass of the community who made the law, by another. The idea of a people through their representatives, making laws whereby arc swept away the life, liberty
L *271 and property of one or a few citizens, by which neither the representatives nor their other constituents are willing to he hound, is too odious to be tolerated in any government where freedom has a name. Such abuses re-suited in the adoption of Magna Charta in England, securing the subject against odious exceptions, which is, and for centuries has been the foundation of English liberty. Its infraction was a leading cause why we separated from that country, and its value as a fundamental rule for the protection of the citizen against legislative usurpation, was the reason of its adoption as part of our constitution. See 2 Inst. 46, and the Dec. of American Independence.
A general and public law prescribing remedies and modes of redress to enforce existing liabilities, can certainly be constitutionally passed. (4 Munf. R. 109. 4 Whea. R. 200, 207.
Can the same be done by a partial or private law? This can as certainly not be done, if the measure of justice to be administered, is not according to the public laws of the land. Yet, nothing can be seen in the present record, which did, or by possibility could, impair the right of the defendant, or deprive him of the power to defend the action, otherwise than as such rights were governed by the general laws of the land previous to the passage of the act of 1821. Nor can it be seen that any constitutional prohibition stood in the way of the Legislature, to prescribe the time when the notice should be given and examination taken. The contract was enforced in point of fact, under the act of 1811, and the mere time of the defendant’s appearance conformably to the notice, did not deprive him of the full benefit of the general laws of the country in resisting the claim. .
Whyte, J udge, concurred.
Judgment affirmed.