*This opinion is subject to revision before*
*publication in the Pacific Reporter*

**2016 UT 55**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of K.A.S., a minor

L.E.S.,
*Appellant,*

*v.*

C.D.M. and M.K.M.,
*Appellees.*

No. 20140966
Filed December 6, 2016

On Direct Appeal

Eighth District, Vernal
The Honorable Clark A. McClellan
No. 132800027

Attorneys:

Marshall Thompson, Salt Lake City, for appellant

Jordan R. Van Oostendorp, Vernal, for appellees

Sean D. Reyes, Att'y Gen., John M. Peterson, Asst. Att'y Gen.,
Tyler R. Green, Solic. Gen., Stanford E. Purser, Deputy Solic. Gen.,
Salt Lake City, amicus curiae

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE PEARCE joined.

JUSTICE DURHAM filed a concurring opinion.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1    This is an appeal from a parental-rights termination order entered in the district court. On November 24, 2014, the district court terminated L.E.S.'s parental rights with respect to K.A.S., making K.A.S. legally available for adoption by her stepfather, C.D.M. L.E.S. appealed the termination order to the Utah Court of Appeals, which subsequently certified the case for transfer to the Utah Supreme Court. The issues presented on appeal are a claim of ineffective assistance of counsel and claims to the right to counsel under the Equal Protection Clause of the Fourteenth Amendment, under the Due Process Clause of the Fourteenth Amendment, and under the due process clause of the Utah Constitution. For reasons explained below, we hold that the denial of counsel violated L.E.S.'s federal due process rights and reverse and remand for further proceedings in accordance with this opinion.

## BACKGROUND

¶ 2    On or about September 23, 2013, C.D.M. and M.K.M. filed a petition for adoption in Uintah County, Utah. C.D.M. sought to adopt his stepdaughter, K.A.S, who was born in 2008. L.E.S., K.A.S.'s biological father, was served with a Notice of Adoption Proceedings on September 23, 2013, requiring him to respond within thirty days if he intended to intervene in or contest the adoption. On or about October 2, 2013, L.E.S., acting pro se, gave notice that he contested the adoption. C.D.M. and M.K.M. then moved to terminate L.E.S.'s parental rights.

¶ 3    The case was set for trial for termination of parental rights on December 10, 2013. M.K.M. was present with counsel. L.E.S. was present in custody, pro se, having been transported from the Uintah County Jail, where he was incarcerated at the time. Upon questioning L.E.S. about his income and assets, the district court found that he "would qualify for court appointed counsel if this were in the Juvenile Court but question[ed] whether [that statutory right to court-appointed counsel] applies to [the] District Court."[1] The district court discussed L.E.S.'s right to counsel with Deputy County Attorney Michael

_____

[1] While the juvenile court ordinarily assumes jurisdiction over termination of parental rights cases, Utah Code section 78B-6-112(1) authorizes the district court to hear such a case "if the party who filed the petition is seeking to terminate parental rights in the child for the purpose of facilitating the adoption of the child."

Drechsel, who "agreed that Uintah County would be obligated to pay for an attorney to represent the indigent father." Based on Mr. Drechsel's input, the district court appointed counsel for L.E.S.

¶ 4   On January 24, 2014, Mr. Drechsel filed a motion to intervene on behalf of Uintah County, asserting that his representations "were made in error and contrary to law" and that there was no right to court-appointed counsel for an indigent party in district court proceedings involving the termination of parental rights. In that motion, he requested that the district court reverse its decision to appoint counsel and that it then dismiss Uintah County from the action. No opposing memoranda were filed by any party. L.E.S.'s court-appointed counsel did not respond or request a hearing on the issue, and L.E.S., because he was represented at the time, did not have an opportunity to oppose the motion pro se. *See infra* ¶ 20. On February 19, 2014, the district court granted the motion to intervene, reversing the appointment of counsel.

¶ 5   The district court held a number of court conferences over the next few months, during which time L.E.S. unsuccessfully attempted to retain counsel. On April 10, 2014, a status conference was held, and the district court set a telephonic scheduling conference with L.E.S., who was then incarcerated at the Utah State Prison, for April 22, 2014. L.E.S. was also informed that he should retain counsel if he so desired.

¶ 6   At the April 22, 2014 scheduling conference, L.E.S., participating by telephone, requested additional time to retain counsel.

¶ 7   An attorney review hearing was held on June 3, 2014, which L.E.S. also attended telephonically. At this hearing, L.E.S. indicated that he "believe[d] his family [was] taking care of his counsel for him but [that he had] not been able to speak with them." The district court set a status conference for June 9, 2014, in order to allow L.E.S. more time to speak with his family.

¶ 8   At that status conference, where L.E.S. was present from prison, the district court noted that L.E.S. "had difficulty contacting family or counsel due to the prison telephone policies to make arrangement[s] to retain counsel." The district court asked an attorney who was serving as counsel for L.E.S. in a juvenile court case to contact L.E.S.'s family in order to "understand where they stand with making counsel arrangements for [L.E.S.] and report back to the [c]ourt." The district court also "ask[ed] the prison to allow [L.E.S.] telephone privileges so he can talk with lawyers and/or family members so this [c]ourt can move this matter along."

¶ 9   On June 17, 2014, L.E.S.'s juvenile court counsel reported to the district court that L.E.S.'s family was working on obtaining counsel and that they requested additional time. L.E.S.'s sisters were present and requested "notification of all hearings to try and help the[ir] brother due to communication issues with [L.E.S.] in prison."

¶ 10   Another status conference was held on June 30, 2014. L.E.S. was supposed to attend telephonically but "was not available by telephone due to changes in probation officers at the prison." L.E.S.'s sisters were present and reported that they had talked with a lawyer, Ms. Bradley, who needed to speak with L.E.S. The district court noted that L.E.S. was "to sign a waiver to allow his sisters to have access to court records to help with his defense." The district court scheduled a bench trial for the termination proceeding for September 26, 2014.

¶ 11   On July 22, 2014, yet another status conference was held "to check the status of counsel for [L.E.S.]." Ms. Bradley had talked with L.E.S. on the telephone right before the hearing and requested additional time to review the information from that telephone meeting.

¶ 12   The next status conference was held on July 29, 2014. L.E.S. attended telephonically and sought to present a verbal motion for continuance, which the district court asked him to file in writing instead.

¶ 13   L.E.S. filed his written motion for continuance with the district court on August 4, 2014, requesting to have the matter continued until at least April 29, 2015, when he expected to be released. In his motion, L.E.S. indicated, among other things, that the prison would "not allow [him] phone access for any legal reason based on a conflict they have," that he could "not obtain adequate employment and [did] not have any other means available to [him] . . . at the prison that would allow [him] the money to pay for counsel," and that he was "at this time financially incapable of hiring counsel." He represented that he had "one opportunity" to talk with a lawyer but that Ms. Bradley "said she was reluctant to take on the case in fear that because of the [above-mentioned] prison policy she would not be able to provide adequate counsel." C.D.M. and M.K.M. opposed the motion for continuance.

¶ 14   No oral argument was requested on the matter of the motion for continuance, and on September 2, 2014, C.D.M. and M.K.M. requested that the briefs be submitted for a ruling. On September 5, 2014, the district court issued a ruling and order denying the motion for continuance. The district court based its decision on the following reasons: the matter had "been pending since September 23, 2013";

"[m]ultiple status hearings ha[d] been held in an effort to provide [L.E.S.] the opportunity to find counsel"; L.E.S. had "had ample time to prepare for the trial, or to obtain counsel to represent him at trial"; and a "permanent living environment and a resolution to these proceedings are in the best interest of the minor child."

¶ 15 On September 8, 2014, the district court held another status conference. L.E.S. was not present. The district court denied the motion to continue and indicated its intent to "[o]rder the state of Utah to transport [L.E.S.] . . . for a termination of parental rights hearing on September 26, 2014."

¶ 16 The termination of parental rights hearing was held on September 26, 2014, and the district court made findings against L.E.S. and found that it was in the best interest of the child for K.A.S. to be adopted by C.D.M. L.E.S. filed a notice of appeal on October 22, 2014. The district court issued its "findings of fact[,] conclusions of law and order" on November 24, 2014, terminating L.E.S.'s parental rights in and to K.A.S.

¶ 17 L.E.S. appealed the district court's termination order to the Utah Court of Appeals, which certified the case for transfer to the Utah Supreme Court on July 7, 2015. We heard oral arguments in the matter on September 2, 2015. On September 21, 2015, we asked for supplemental briefing from the parties and the Attorney General's Office on the constitutional question raised by L.E.S.'s argument that Utah Code section 78A-6-1111(1)(a) (2012) and section 78A-6-1111(1)(a)–(c) (2014) (two versions of the right-to-counsel provision of the Juvenile Court Act) violate equal protection under the Fourteenth Amendment and due process. Following supplemental briefing, oral arguments were again heard on March 2, 2016.

¶ 18 L.E.S. raises four issues on appeal: a claim of ineffective assistance of counsel and claims to the right to counsel under the Equal Protection Clause of the Fourteenth Amendment, under the Due Process Clause of the Fourteenth Amendment, and under the due process clause of the Utah Constitution. We hold that, even though not preserved, the constitutional issues may be reached in this case under the exceptional circumstances exception. For reasons explained below, we hold that the denial of counsel violated L.E.S.'s federal due process rights. We reverse and remand for further proceedings in accordance with this opinion.

**PRESERVATION**

¶ 19 We first address the issue of preservation and hold that the constitutional arguments for the right to counsel may be reached in this case under the exceptional circumstances exception. When an issue is not properly preserved, we will address the issue for the first time on appeal "only if (1) the appellant establishes that the district court committed 'plain error,' (2) 'exceptional circumstances' exist, or (3) in some situations, if the appellant raises a claim of ineffective assistance of counsel in failing to preserve the issue." *State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867 (citation omitted); *see also State v. Munguia*, 2011 UT 5, ¶¶ 10–13, 253 P.3d 1082; *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 25 n.12, 203 P.3d 943; *State v. Lee*, 2006 UT 5, ¶ 24, 128 P.3d 1179. Exceptional circumstances is a doctrine that "applies to rare procedural anomalies." *Jacob v. Bezzant*, 2009 UT 37, ¶ 34, 212 P.3d 535. We apply this "exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *Id.* (internal quotation marks omitted).

¶ 20 Exceptional circumstances is a narrow exception but one that is met by the unusual procedural circumstances in this case. The district court initially granted L.E.S. "appointed counsel in a parental-rights termination proceeding initiated by a private party in district court." The deputy county attorney, on whose advice the court had relied in appointing counsel, later filed a motion to intervene, arguing that the statute did not provide a right to counsel for termination proceedings in district court. L.E.S.'s court-appointed counsel failed to respond to the motion. Additionally, since L.E.S. was represented by counsel, L.E.S. had no right to oppose the motion himself. *See State v. Navarro*, 2010 UT App 302, ¶ 3, 243 P.3d 519 (per curiam) ("[T]he [criminal] defendant may not benefit from the assistance of counsel while simultaneously filing pro se motions."); *State v. Wareham*, 2006 UT App 327, ¶ 33, 143 P.3d 302 ("The [criminal] defendant may choose self-representation or the assistance of counsel, but is not entitled to a 'hybrid representation' where he could both enjoy the assistance of counsel and file pro se motions. The only exception to this rule is that a defendant may file a pro se motion to disqualify his appointed counsel." (citation omitted)). The court granted the unopposed motion, denying L.E.S. court-appointed counsel. L.E.S. subsequently found himself unrepresented and would have to make a sophisticated constitutional argument for the right to counsel. Most importantly, L.E.S. had no technical vehicle for making such an argument because he

had already lost on the issue of the right to counsel, and "[m]otions to reconsider are not recognized by the Utah Rules of Civil Procedure." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615.

¶ 21 We conclude that these circumstances constitute one of those "rare procedural anomalies" that qualify for the exceptional circumstances exception to the preservation rule.[2] When a party is appointed counsel who refuses to make an argument for the right to counsel when that right is challenged, and the party is barred from making that argument, and the party then is denied counsel and subsequently would have to make a sophisticated constitutional argument for the right to counsel with no technical vehicle for making such an argument, exceptional circumstances are met.[3] Thus, under the exceptional circumstances exception, we may reach L.E.S.'s constitutional arguments for the right to counsel in parental-rights termination proceedings, even though they were raised for the first time on appeal.

## ANALYSIS

¶ 22 We apply the test from *Lassiter v. Department of Social Services* and determine that L.E.S. had a federal due process right to counsel in the district court proceedings and that that right was erroneously

---

[2] To conclude otherwise would be to require L.E.S. to have filed a motion that is not technically recognized by the Utah Rules of Civil Procedure. We decline to require parties to file motions that our cases say do not exist. *See Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615 ("[T]rial courts are under no obligation to consider motions for reconsideration . . . .").

[3] Our holding today should not be construed to mean that the exceptional circumstances exception applies any time a lawyer fails to make an argument. Rather, our holding is intricately tied to the deprivation of counsel under the unique facts of this proceeding. Here, a lawyer was appointed, but abdicated all responsibility by failing to make any argument regarding L.E.S.'s right to representation, constructively denying L.E.S. counsel and leaving him without the technical ability to present to the district court his own, separate argument for counsel. Moreover, L.E.S. is without a meaningful malpractice action as that does not provide a vehicle for regaining his parental rights in K.A.S.

denied. 452 U.S. 18 (1981).[4] L.E.S. correctly argues that "the trial court erred by failing to consider the *Eldridge* factors" as applied by the United States Supreme Court in *Lassiter*.[5] In *Lassiter*, the Court

---

[4] Because we find that L.E.S. had a federal due process right to counsel, and as a matter of constitutional avoidance, we do not reach his other constitutional arguments for the right to counsel, namely the arguments under state due process and federal equal protection. Regarding the federal equal protection argument, we note that L.E.S. challenged the constitutionality of two sections of the Juvenile Court Act. New versions of those provisions were issued while the case was still ongoing in the district court, and we requested additional briefing from the parties and briefing from the Attorney General's Office regarding the constitutionality of those statutes and which version applied to the proceedings. Since then, new versions have again been issued in 2016. If we were to consider whether equal protection provides a right to counsel, we would have to again request briefing about which version of the statute would apply, which would further delay resolution. Thus, the concern about additional delay in a case where time is of the essence is an additional reason for us to not reach L.E.S.'s other constitutional arguments.

Our holding today also means we do not need to address the constitutionality of the relevant section of the Juvenile Court Act—Utah Code section 78A-6-1111(2)—under federal due process. This section, at least as of 2014, prohibited court-appointed counsel for proceedings initiated by a private party in juvenile courts, but it neither provided for nor prohibited the appointment of counsel in district courts. As we explain in this opinion, the district court had an independent obligation to conduct a *Lassiter* analysis, and nothing in section 1111(2) is to the contrary, as by its own terms, the Juvenile Court Act applies only to juvenile court proceedings. *See* UTAH CODE § 78A-6-105(10) ("'Court' means the juvenile court."). Therefore, as we have already decided that section 1111(2) is not facially unconstitutional in *In re E.K.S.*, 2016 UT 56, __ P.3d __, and because we do not resolve this case under the Juvenile Court Act, we need not and do not reach the issue of whether section 1111(2) is constitutional as applied under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

[5] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) "propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk

(cont.)

considered whether indigent parents in parental-rights termination proceedings have a right to counsel. The Court recognized that there is a presumption against the right to counsel unless an indigent litigant's physical liberty is at stake but held that that presumption may be overcome by the *Eldridge* factors. It determined that courts "must balance [the *Eldridge* factors] against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." *Id.* at 27.

¶ 23 It appears from the record that the district court found that L.E.S. was indigent. Upon making that finding, the district court was required as a matter of law to apply the test set forth in *Lassiter* in order to determine whether L.E.S. had a right to counsel. Nowhere in the record does it appear that the district court applied the *Lassiter* test. Instead, the district court appears to have based its decision that L.E.S. had no right to counsel on an interpretation of the right-to-counsel provision in the Juvenile Court Act and the lack of a corresponding provision in the district court context. This was error. And "because child-custody litigation must be concluded as rapidly as is consistent with fairness," rather than remand for additional findings, "we decide today whether the [district court] judge denied [L.E.S.] due process of law" under the Fourteenth Amendment by reversing its original appointment of counsel for L.E.S. *Id.* at 32. (footnote omitted).

¶ 24 According to *Lassiter*,

[i]f, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.

*Id.* at 31. To put it more plainly, where the parent's interests are at their strongest, the State's interests at their weakest, and the risks of error at their peak,[6] the presumption against the appointment of counsel has

---

that the procedures used will lead to erroneous decisions." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981).

[6] The dissent suggests that "the *Lassiter* standard is highly dependent on the third . . . factor" (i.e., the risk of error), almost to the

(cont.)

been overcome and due process requires the appointment of counsel. We now proceed to analyze the *Eldridge* factors in the context of the case at hand and determine that they overcome the presumption against the right to counsel. Thus, we conclude that L.E.S. had a federal due process right to counsel in the district court proceedings. Because that right was denied, we reverse and remand for further proceedings in accordance with this decision.

## I. L.E.S.'S INTERESTS

¶ 25 First, we consider the private interests at stake: L.E.S.'s parental interest in his daughter, K.A.S. A parent's "right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). In fact, "[t]he right of a fit, competent parent to raise the parent's child without undue government interference is a fundamental liberty interest that has long been protected by the laws and Constitution and is a fundamental public policy of this state." UTAH CODE § 62A-4a-201(1)(c);[7] *see id.* § 78A-6-503(1) ("Under both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child."); *id.* § 78A-6-503(4) ("The court should give serious consideration to the fundamental right of a parent to rear the parent's child, and concomitantly, [to] the right of the child to be reared by the child's natural parent."); *see also Lassiter*, 452 U.S. at 38 ("[F]ar more precious . . . than property rights, . . . parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men." (first and second alterations in original)

---

exclusion of the first two factors. *Infra* ¶ 70. We cannot agree with this proposition. It is true that the third factor is important and perhaps has drawn the most attention, but that is not to say that the other two factors do not play a role. We read *Lassiter* to require all three. *Lassiter*, 452 U.S. at 31 ("The dispositive question . . . is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel . . . , suffice to rebut that presumption . . . .").

[7] Unless otherwise indicated, citations are to the current edition of the Utah Code. We have omitted the date from citations to the current edition.

(citation omitted) (internal quotation marks omitted)). Therefore, as noted in *Lassiter*, a "parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Id.* at 27; *see* UTAH CODE § 62A-4a-201(1)(b) ("Until the state proves parental unfitness, . . . the child and the child's parents share a vital interest in preventing erroneous termination of their natural relationship."). Furthermore, the Court indicated that the parent's "extremely important" interest "may be supplemented by the dangers of criminal liability inherent in some termination proceedings." *Lassiter*, 452 U.S. at 31.

¶ 26 In this case, the parent's interests were at their strongest or very nearly so. L.E.S.'s right, as a parent, to the companionship, care, custody, and management of K.A.S. is clearly an important interest. Thus, he has a commanding interest in the accuracy and justice of the parental-rights termination proceeding. Furthermore, there is some concern regarding the risk of self-incrimination in this case, where the district court found that L.E.S. should have taken K.A.S.'s mother to court for refusing to facilitate visits but that he did not do so because "he was afraid because he was on drugs," and where the district court also noted that L.E.S.'s "extensive substance abuse is terms of neglect." It is unclear whether these findings were based on testimony elicited from L.E.S. or from evidence that was submitted, but L.E.S. did testify and was cross-examined, and it certainly appears that there was a risk of self-incrimination through the disclosure of information regarding his use of controlled substances.[8] Thus, we conclude that L.E.S.'s interests were at their strongest or very nearly so.

---

[8] Aside from the risk of self-incrimination, there might also be some danger of criminal liability based on allegations in the petition to terminate L.E.S.'s rights. In *Lassiter*, it appears that "the petition to terminate Ms. Lassiter's parental rights contained no allegations of neglect or abuse upon which criminal charges could be based." *Lassiter*, 452 U.S. at 32. In contrast, the petition in this case alleged neglect and emotional abuse, including a statement that L.E.S. "has not paid child support for years." Admittedly, however, it is not clear whether the allegations here are sufficient to potentially lead to criminal charges (for example, it is unclear whether "child support" refers to court-ordered child support).

## II. THE STATE'S INTEREST

¶ 27 Second, we consider whether the State's interests in not appointing counsel were at their weakest. As the Court pointed out in *Lassiter v. Department of Social Services*, the State has divergent interests—it has an interest in appointing counsel as well as in not appointing counsel. The State has a legitimate pecuniary interest in not appointing counsel. 452 U.S. 18, 28 (1981). However, the State's pecuniary interest "is hardly significant enough to overcome private interests as important as those here." *Id.* The Court in *Lassiter* also recognized that "the State may share the indigent parent's interest in the availability of appointed counsel" because of the State's "urgent interest in the welfare of the child" and its "interest in an accurate and just decision." *Id.* at 27. In *Lassiter*, the State was clearly invested in and therefore particularly interested in the child's welfare, as the parental-rights termination proceeding in that case was initiated by the Department of Social Services after the child had been in foster care for more than two years. *Id.* at 20–21, 28.

¶ 28 The State's interest in not appointing counsel in the case at hand was relatively weak. The State, of course, had a legitimate pecuniary interest in not appointing counsel, but as in *Lassiter*, we recognize that that interest is hardly significant enough to overcome an interest as important as a parent's rights to his or her child. And the State's interest in terminating L.E.S.'s parental rights was certainly less urgent in this case than it was in *Lassiter*, because this parental-rights termination proceeding was initiated and advanced by a private party rather than by the State. Regardless, the State still had an interest in the welfare of the child, and the State is necessarily involved in the termination of parental rights since only the State can terminate a parent's rights to his or her child. Thus, the State still "share[d] with the parent an interest in a correct decision," which is more "likely to be obtained through the equal contest of opposed interests." *Id.* at 28, 31. In this case, the State's interest in appointing counsel was stronger than its interest in *not* appointing counsel. Therefore, we conclude that the State's interest in not appointing counsel was relatively weak.

### III. RISKS OF ERROR

¶ 29 Third, we consider whether the risks of error were at their peak. Specifically, we consider "the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 28 (1981). Similarly to North Carolina law as set out in *Lassiter*, Utah law

provides a number of procedures to help ensure accurate decisions in parental-rights termination proceedings.[9] By way of example, the petition must include "the grounds on which termination of parental rights is sought." UTAH CODE § 78A-6-505(1)(f). Additionally, a hearing must be held on the question of termination of parental rights, and the petitioner must "establish the facts by clear and convincing evidence." *Id.* § 78A-6-506(2)–(3).

¶ 30   Despite such protections, there can still be considerable risk of error in parental-rights termination proceedings, which can be complicated for the parent seeking to defend his or her parental rights without the aid of counsel. The Court in *Lassiter* recognized the argument that parents are "uniquely well informed" about the subject of the parental-rights termination hearing (the parent's relationship with the child) but indicated that the ultimate issues in such cases are not always simple. *Lassiter*, 452 U.S. at 29–30. The Court pointed out that most parents would have difficulty understanding and confuting expert medical and psychiatric testimony, which is sometimes presented. *Id.* at 30. Additionally, it recognized that many parents facing termination proceedings may "be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation." *Id.* Consequently, "courts have generally held that the State must appoint counsel for indigent parents at termination proceedings." *Id.*

¶ 31   In the case at hand, the risks of error were significant. Because this case involves privately initiated termination proceedings, L.E.S. has not enjoyed the additional protections provided in state-initiated termination cases. *See, e.g.*, UTAH CODE § 62A-4a-203(1)(a) ("[T]he division shall . . . make reasonable efforts to prevent or eliminate the need for removal of a child from the child's home . . . ."); *id.* § 62A-4a-202(1)(a) ("[T]he division shall provide in-home services for the purpose of family preservation to any family with a child whose health and safety is not immediately endangered, when . . . the family is in

---

[9] The procedures outlined in this paragraph are some of those applicable to the particular circumstances of this case as opposed to an exhaustive listing of procedures for ensuring accurate decisions in parental-rights termination proceedings generally under Utah law. And although they appear in the Juvenile Court Act, we assume here that these procedures apply to parental-rights termination proceedings that take place in district court.

crisis . . . ."); *id.* § 62A-4a-201(4) (indicating that after a temporary out-of-home placement, "the division may . . . (a) when safe and appropriate, return the child to the child's parent; or (b) as a last resort, pursue another permanency plan"); *id.* § 78A-6-503(3) ("If the party moving to terminate parental rights is a governmental entity, the court shall find that any actions or allegations made in opposition to the rights and desires of a parent regarding the parent's child are supported by sufficient evidence to satisfy a parent's constitutional entitlement to heightened protection against government interference with the parent's fundamental rights and liberty interests."); *see also infra* ¶ 35 n.10. Also, this case appears particularly disorienting because the court initially appointed counsel for L.E.S. upon a finding of indigence and later reversed the appointment of counsel based on an unopposed motion asserting that Utah law did not provide a right to counsel for termination proceedings in the district court. This left L.E.S. with the need to subsequently make a sophisticated constitutional argument for the right to counsel that he was unable to make without the assistance of counsel.

¶ 32 Furthermore, L.E.S. was incarcerated throughout the duration of the proceedings, and it is clear from the record that this led to significant communication difficulties and at times even his inability to attend proceedings, either in person or telephonically. The district court recognized early on that L.E.S. "had difficulty contacting family or counsel due to the prison telephone policies to make arrangement[s] to retain counsel." L.E.S.'s sisters attended several of the proceedings and attempted to help L.E.S. with his defense, but their efforts appear to have been hampered by communication issues with L.E.S. in prison. *Supra* ¶¶ 7–10. L.E.S. was unable to telephonically attend the status conference during which the final parental-rights termination hearing was scheduled "due to changes in probation officers at the prison" that resulted in him not being available by telephone. *Supra* ¶ 10. He also was not present at the September 8, 2014 status conference, where his motion to continue was denied. *Supra* ¶ 15.

¶ 33 Additionally, although the district court held a number of status conferences in order to help L.E.S. obtain counsel, the district court mentions only one attorney that L.E.S. actually talked with, and L.E.S. reported to the district court that that attorney "was reluctant to take on the case in fear that because of the . . . prison policy she would not be able to provide adequate counsel."

¶ 34 While no expert medical or psychiatric testimony or other similarly complicated evidence was brought before the court, it is

possible that had L.E.S. been represented by counsel, such testimony may have been brought. At this stage, it is difficult to conclude that the case below was simple and uncomplicated, dealing exclusively with issues about which L.E.S., as K.A.S.'s parent, was "uniquely well informed," when the apparent simplicity of the record may be due to the fact that L.E.S. represented himself pro se and had no opportunity to present more complicated evidence and argument with the aid of counsel. Thus, we conclude that the risks of error in this case were significant, even if not quite at their peak.

### IV. *ELDRIDGE* FACTORS BALANCED AND WEIGHED AGAINST PRESUMPTION

¶ 35 Finally, we balance the three *Eldridge* factors against each other and then weigh them against the presumption against the right to counsel. As already indicated, L.E.S.'s interest is "a commanding one," and the State shares L.E.S.'s interest in reaching a correct decision. When balancing these interests in favor of appointing counsel against the State's relatively weak, albeit legitimate, pecuniary interest in *not* appointing counsel, the equation clearly comes out in favor of appointing counsel. And when we add the significant risks of error to this balance, it becomes abundantly clear that the *Eldridge* factors favor a right to counsel in this case. Upon weighing these significant interests against the presumption against the appointment of counsel, we hold that they outweigh that presumption and that L.E.S. therefore had a right to appointed counsel under the Due Process Clause of the Fourteenth Amendment. Because the initial appointment of counsel was reversed and L.E.S. had to proceed pro se, his federal due process right to counsel was violated.[10]

---

[10] In *Lassiter*, the Court's analysis includes the mother's lack of interest shown in the child and disinclination to participate in the judicial process. The Court observed that "the weight of the evidence that [Ms. Lassiter] had few sparks of . . . interest [in her son] was sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 32–33 (1981). In the case at hand, however, L.E.S. indicates that he tried for years "to contact or have contact with [K.A.S.] but her mother refused or avoided the subject." He provided copies of a number of Facebook messages to back up that assertion. In those messages, he expressed that he missed K.A.S. and wanted to see her again, including a request "to arrange visitations" and to stop

(cont.)

¶ 36 The dissent contends that our analysis "turns th[e] presumption [against the right to appointed counsel in civil cases] on its head" by "virtually guarantee[ing] appointment of counsel in most every case in which a parent's rights are in jeopardy." *Infra* ¶ 48. We disagree. We note, at the outset, that our task is simply to apply *Lassiter* to the case before us. That is, our task—our only task—is to consider whether the presumption against L.E.S.'s having a right to counsel is overcome because (1) L.E.S.'s interest in appointed counsel is strong, (2) the State's interest in denying appointed counsel is weak, and (3) the

---

"stalling." Granted, L.E.S. did not take K.A.S.'s mother to court for refusing to facilitate visits, because "he was afraid because he was on drugs." *Supra* ¶ 26. But unlike the mother in *Lassiter*, L.E.S. has clearly shown interest in his child.

L.E.S. has also shown that interest through his efforts to participate in these proceedings, again unlike the mother in *Lassiter*. In *Lassiter*, the mother "had expressly declined to appear at the 1975 child custody hearing" and "had not even bothered to speak to her retained lawyer after being notified of the termination hearing." *Lassiter*, 452 U.S. at 33. Her "failure to make an effort to contest the termination proceeding was [found to be] without cause." *Id.* Here, however, L.E.S. gave notice pro se that he contested the adoption, and he attended a number of court conferences, both in person and telephonically, and attempted to retain counsel. *Supra* ¶¶ 2, 5–7. He also filed, again pro se, a motion for continuance, and upon the denial of that motion and termination of his rights, he filed a pro se notice of appeal and has continued to pursue the matter in court. *Supra* ¶¶ 13, 16–17.

Thus, unlike in *Lassiter*, we cannot conclude that "the presence of counsel . . . could not have made a determinative difference" based on the parent's indifference to the child. *See* 452 U.S. at 32–33. Furthermore, L.E.S. has actively participated in the case, unlike the mother in *Lassiter*, whose "plain demonstration that she is not interested in attending a hearing" was among the circumstances considered by the Court in holding that "the trial court did not err in failing to appoint counsel." *Id.* at 33.

Another difference between the two cases, which is not, however, included in the analysis section in *Lassiter*, is the length of incarceration of the parent. In *Lassiter*, the mother had been sentenced to "25 to 40 years of imprisonment." *Id.* at 20. L.E.S., in contrast, expected to be released from prison within nine months of his August 4, 2014 motion for continuance. *See supra* ¶ 13.

risks of error are high. Our application of *Lassiter* in this case leads us to the conclusion that L.E.S. is entitled to counsel. While it would not surprise us if the presumption against the right to appointed counsel in civil cases were overcome with greater frequency in parental-rights termination proceedings than in other contexts where the stakes are lower and the core issue in the proceedings is less complicated than whether to sever the parent-child relationship, these potential empirical results do not drive our analysis. Our task is to faithfully apply *Lassiter* to the facts of each case before us; whatever pattern of outcomes emerges from this exercise is the pattern of outcomes required by the law. *Cf. Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 30 & n.6 (1981) (noting—without apparent concern—that the presumption against the right to counsel in civil cases has "generally" been overcome in the parental-rights termination context).

¶ 37  The dissent understands the effect of *Lassiter*'s presumption to be that the right to counsel in civil cases—including parental-rights termination cases—must be found only rarely. *See infra* ¶ 63 n.9. This is a misreading of *Lassiter*. To be sure, *Lassiter* acknowledges that there is a presumption against the right to counsel in civil cases. But *Lassiter* nowhere implies that the effect of this presumption is that if courts regularly find a right to appointed counsel in parental-rights termination proceedings they are doing it wrong. To the contrary, *Lassiter* emphasizes that

> the ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident . . . .

*Lassiter* 452 U.S. at 30. For this reason, *Lassiter* notes, "courts have generally held that the State must appoint counsel for indigent parents at termination proceedings." *Id.* Nor does *Lassiter* lament, or seek to change, this state of affairs. To be sure, at one point the *Lassiter* court conceded that it could not "say that the Constitution requires the appointment of counsel in every parental termination proceeding." *Id.* at 31. And it is certainly true that the *Lassiter* court concluded, under the specific facts before it, that counsel did not need to be appointed.

But *Lassiter*'s agnosticism about the frequency with which the Constitution would end up requiring the appointment of counsel in parental-rights termination proceedings is a far cry from a hard-nosed insistence that lower courts should work to make sure that the right to counsel in parental-rights termination cases is only grudgingly found.

¶ 38 We also disagree with the dissent that our application of *Lassiter* "demands appointment in the run of the mill case." *Infra* ¶ 73 n.17. Instead, our application of *Lassiter* requires the appointment of counsel whenever the parent's interest in appointed counsel is strong, the state's interest is weak, and the risks of error are high. Our opinion is consistent with the proposition that in a case with circumstances like *Lassiter*—where, for example, the parent has not taken an interest in the proceedings and "the weight of the evidence" of the parent's lack of interest in the child is "great"—or in a case where the parent faced fewer procedural or institutional barriers to availing himself of the court, the presumption against the right to counsel will not be overcome. *Lassiter*, 452 U.S. at 32; *cf. supra* ¶ 35 n.10 (noting evidence of L.E.S.'s interest in parenting K.A.S.). But, again, like the Supreme Court in *Lassiter*, our analysis is not driven by any empirical speculation about the frequency with which the presumption against the right to counsel will be overcome in parental-rights termination proceedings. We focus only on application of the legal test.[11] And, for the reasons we have

---

[11] In any event, we note that even if application of the *Lassiter* test will result in the right to appointed counsel in many cases in which a parent's rights are in jeopardy, this result stems, in large part, from the existence of a statutory right to counsel under Utah Code section 78A-6-1111(1)(c). Under that section, indigent parents have the right to counsel in parental-rights termination proceedings initiated by the State or a political subdivision of the State in juvenile court. *Id.* In such state-initiated termination cases, the risk of error is likely to be lower because of the State's goal to preserve families if possible and because of additional protections such as the provision of in-home services and the requirement of "sufficient evidence to satisfy a parent's constitutional entitlement to heightened protection against government interference with the parent's fundamental rights and liberty interests." UTAH CODE §§ 62A-4a-201(1)(a), 78A-6-503(3); *see also id.* §§ 62A-4a-203(1)(a), 62A-4a-202(1)(a). Because of the lower risk of error, the presumption against the right to counsel would be less likely to be overcome. However, because of the statutory right to counsel under Utah Code

(cont.)

explained, our application of that test leads us to the conclusion that the presumption against the right to counsel is overcome in this case.

## CONCLUSION

¶ 39 As discussed, we conclude that in the narrow circumstances of this case, the exceptional circumstances exception to the preservation requirement applies to allow us to reach L.E.S.'s constitutional arguments for the right to counsel. We also hold, based on the *Lassiter* test, that L.E.S. had a federal due process right to counsel in this case and that that right was improperly denied.[12] Therefore, we reverse the decision of the court below.

---

section 78A-6-1111(1)(c), the *Lassiter* test is not applied in such cases. Consequently, while it might appear that the presumption in *Lassiter* is "turn[ed] . . . on its head," in reality the *Lassiter* test is simply never applied to many of the cases in Utah in which the presumption might prevail.

[12] Citing *In re J.D.M.*, 810 P.2d 494 (Utah Ct. App. 1991), L.E.S. argues that he is entitled to his attorney fees on appeal. However, L.E.S. misreads *In re J.D.M.* In Utah, a party is generally entitled to attorney fees only when such fees are authorized by contract or by statute. *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 11, 160 P.3d 1041 ("Generally, attorney fees are awarded only when authorized by contract or by statute."). Neither contractual nor statutory authorization is present in the case at hand. And to the extent that L.E.S. is arguing for an exception to the general rule that attorney fees are awardable only when authorized by contract or by statute, that argument is inadequately briefed and we reject it.

We also recognize that there may be an equal protection argument for requiring attorney fees on appeal to be paid in termination proceedings originating in district court as they are for those originating in juvenile court. UTAH CODE § 78A-6-1111(1)(g). There may also be an argument that *Lassiter* requires appointment of counsel on appeal for indigent parties. However, these arguments are not before us today. Accordingly, we deny L.E.S.'s request for attorney fees on appeal.

In re K.A.S.

DURHAM, J., concurring

¶ 40 However, although L.E.S. had a federal due process right to counsel earlier, it is unclear from the facts of the case whether he has such a right now. The right to counsel is available only to indigent individuals. During the proceedings below, L.E.S. requested a continuance until at least April 29, 2015, and in his briefing to the Utah Supreme Court, he indicated that he had hoped "to push the proceeding back to April when he would be out of prison and could pay for private counsel." Based on that information, L.E.S. is presumably no longer incarcerated, having presumably been released more than a year ago. Whether he is working and his current financial status are unknown to us. Thus, we do not know whether he is indigent. We therefore instruct the district court to first make a determination of whether L.E.S. is indigent. If the district court finds L.E.S. indigent, it should then proceed to apply the *Lassiter* test based on the facts and circumstances as they stand at that point, in order to determine whether L.E.S. should be appointed counsel based on federal due process for the parental-rights termination proceeding going forward.

―――――――――

JUSTICE DURHAM, concurring:

¶ 41 I concur in the analysis and the result of the majority opinion's treatment of the federal due process question. I write separately to note that the court should have first analyzed the state due process claim raised by the appellant.

¶ 42 "[A] state court always is responsible for the law of its state before deciding whether the state falls short of a national standard, so that no federal issue is properly reached when the state's law protects the claimed right." Hans A. Linde, *E Pluribus — Constitutional Theory and State Courts*, 18 GA. L. REV. 165, 178 (1984).

> The right question is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state's law may prove to be more protective than federal law. The state law also may be less protective. In that case the court must go on to

> decide the claim under federal law, assuming it has been raised.

*Id.* at 179. This court has, on numerous occasions, cited this methodology favorably.

¶ 43 In *West v. Thomson Newspapers,* we observed that, as a matter of logic,

> [t]he proper sequence is to analyze the state's . . . constitutional law[] before reaching a federal constitutional claim. This is required not for the sake either of parochialism or style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law.
>
> By looking first to state constitutional principles, we also act in accordance with the original purpose of the federal system. Prior to the incorporation of the Bill of Rights, state constitutions were the only source of protection for individual rights and have continued as important sources of such rights ever since. Further, a growing number of courts have recognized both the utility and the legitimacy of fully exhausting state law before resorting to the federal constitution and accordingly have adopted the primacy model.

872 P.2d 999, 1006 (Utah 1994) (first alteration in original) (footnote omitted) (citations omitted) (quoting *Sterling v. Cupp*, 625 P.2d 123, 126 (Or. 1981)).

¶ 44 In this case, appellant devoted nearly ten pages of a thirty-four page opening brief to the state Due Process Clause, and pointed out in his reply brief that appellees had failed to respond to his state constitutional arguments. Under those circumstances, I believe the court should have addressed them. Notwithstanding the ultimate result in this case under federal law, there will remain an open question as to the constitutionality of Utah's appointment of counsel regime. *See, e.g.,* *In re Adoption of A.W.S.*, 339 P.3d 414, 419–20 (Mont. 2014) (concluding that Montana's constitutional right to equal protection requires that counsel be appointed for indigent parents in termination proceedings brought under the state's Adoption Act).

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶ 45   Parental-rights termination cases are heart-wrenching. They present problems of enormous consequence—of severance of one of the most cherished of all human bonds, with the safety and welfare of children hanging in the balance. This is a matter on which our sensitivity for justice is heightened. And for that reason I can appreciate a desire to find a way to secure the appointment of counsel in a case like this one. As a pure policy matter, I see significant upsides in assuring that a parent has the benefit of legal counsel before his legal rights are terminated.

¶ 46   That said, the issues before us are not policy questions. We are not legislators voting on a statute guaranteeing appointed counsel in parental-termination cases. We are judges faced with questions of law—under our law of preservation, and on matters of statutory and constitutional interpretation. And I find no basis in law for the majority's conclusions.

¶ 47   I respectfully dissent. First, I would hold that the father failed to preserve a claim for a right to counsel under the Due Process Clause and does not qualify under an exception to the rule of preservation. The "exceptional circumstances" exception invoked by the majority is not really a legal exception; it is more of a reservation of this court's "right" to reach the merits when we want to. We have never articulated concrete standards giving any distinct content to "exceptional circumstances." That is troubling. We, of course, have the final say and thus the ability to sidestep our own rules and precedents. But the fact that we are a court of last resort does not justify our exercise of power in a black box. We should exercise our discretion in a transparent and consistent manner. I see no way to do so under the "exceptional circumstances" doctrine. I would accordingly repudiate the exception here and going forward, and limit our review of unpreserved errors to those qualifying under the plain error doctrine or on a claim for ineffective assistance of counsel.

¶ 48   Second, even assuming for the sake of argument that we can excuse the father's lack of preservation, I would reject his constitutional claim on its merits. The standard set forth in *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), prescribes a presumption *against* appointment of counsel in parental-rights termination cases. The majority turns that presumption on its head. It applies the *Lassiter* test in a way that virtually guarantees appointment of counsel in most every case in which a parent's rights are in jeopardy. That may be a

good idea as a policy matter, but it is not required by the Due Process Clause—under either the United States Constitution or the Utah Constitution. I would so hold.

I

¶ 49 I find no basis for excusing L.E.S.'s failure to preserve a constitutional claim to a right to counsel. He never asserted such a claim in the district court. He never invoked the Due Process Clause as a basis for appointment of counsel, and certainly never asked the district judge to apply the due process balancing test in *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981).

¶ 50 The majority agrees. It concedes that L.E.S.'s constitutional claims were not preserved. Yet it still reaches the merits on the basis of so-called "exceptional circumstances." In so doing the court says that we reserve this exception for "unusual circumstances" in which "our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *Supra* ¶ 19 (quoting *Jacob v. Bezzant*, 2009 UT 37, ¶ 34, 212 P.3d 535). And it cites "unusual procedural circumstances in this case" that purportedly qualify L.E.S. for the exception. *Supra* ¶ 20.

¶ 51 I respectfully dissent. On reflection[1] I have come to the conclusion that the "exceptional circumstances" doctrine should be repudiated. Our court has invoked this "exception" on a number of occasions over the years. Yet we have never really given it any distinct

---

[1] When we issued a supplemental briefing order at an earlier stage of this case, we indicated that we had "unanimously" concluded that L.E.S. qualified for an exception to the rule of preservation. *Supplemental Briefing Order* (September 21, 2015). That was true at the time we issued the order. But I have since come to see the matter differently. Perhaps that makes me a flip-flopper. I prefer to see it as wisdom coming late—and better than not at all. *See* ARTHUR CONAN DOYLE, *The Man with the Twisted Lip*, *in* THE ADVENTURES OF SHERLOCK HOLMES 101 (Sam Vaseghi ed., Wisehouse Classics 2016) (1892) ("'It has been in some points a singular case,' said Holmes, flicking the horse on into a gallop. 'I confess that I have been as blind as a mole, but it is better to learn wisdom late than never to learn it at all.'"). In all events I will say, as have many judges on many occasions, that the matter "does not appear to me now as it appears to have appeared to me then." *Andrews v. Styrap*, 26 L.T.R. (N.S.) 704, 706 (Ex. 1872) (Bramwell, B.).

content. In fact we seem to have gone out of our way to do the opposite. We have spoken of the exceptional circumstances exception as "ill-defined," *State v. Holgate*, 2000 UT 74, ¶ 12, 10 P.3d 346, and our court of appeals has referred to it as a doctrine that is not "precise" and cannot "be analyzed in terms of fixed elements," *State v. Irwin*, 924 P.2d 5, 8 (Utah Ct. App. 1996).

¶ 52 The majority follows a similar course in this case. Instead of defining the content of the doctrine, the court continues the practice of speaking in generalities. It concludes only that this is a "narrow exception" reserved for "unusual procedural circumstances," and proceeds to list the circumstances in this case that strike the court as noteworthy. *Supra* ¶ 20. That is doctrinally circular. If we are unwilling or unable to define the content of the exceptional circumstances doctrine, then we don't really have a doctrine; we have a reservation of our "right" to ignore a preservation problem when we find it expedient.

¶ 53 That strikes me as unacceptable. This is a court of law. We owe it to both the parties and the lower courts to operate in accordance with a transparent set of legal principles. Such principles assure the opportunity for evaluation of our decisions. They minimize the risk of arbitrary decision making. And they facilitate reliance on our caselaw.

¶ 54 We undermine all of the above when we hide our analysis in the confines of a black box. That is the effect, in my view, of the "exceptional circumstances" doctrine applied today. Through the high-sounding rhetoric of "manifest injustice" and "rare procedural anomalies," *supra* ¶ 19, we create the appearance of a legal standard. But because we are unwilling to prescribe actual elements or standards for this doctrine, we are really just reserving an unchecked right to reach the merits when we want to.[2]

¶ 55 The majority identifies "circumstances" that it deems "exceptional." It notes that the district judge "initially granted" L.E.S.'s

---

[2] *See* Tory A. Weigand, *Raise or Lose: Appellate Discretion and Principled Decision-Making*, 17 Suffolk J. Trial & App. Advoc. 179, 181 (2012) (noting that application of an exceptional circumstances exception can lead to "loss of clarity and consistency" due to "the lack of uniform criteria or identifiable scale as to individual or cumulative weight to be given to the multi-factor strain of the discretionary exception").

request for appointed counsel before he switched course. *Supra* ¶ 20. And it concludes that that appointment left L.E.S. "unrepresented" and unable "to make a sophisticated constitutional argument for the right to counsel." *Supra* ¶ 20. With this in mind, the court purports to state a general holding: "When a party is appointed counsel who refuses to make an argument for the right to counsel when that right is challenged, and the party is barred from making that argument, and the party then is denied counsel and subsequently would have to make a sophisticated constitutional argument for the right to counsel with no technical vehicle for making such an argument, exceptional circumstances are met." *Supra* ¶ 21. But that is not the statement of a general rule. It is a summary of the facts of this case, followed by a conclusion that we prefer to reach the merits.[3]

¶ 56 The court's summary of the circumstances of the case, moreover, make this one seem rather *un*exceptional. First, I cannot see how the initial appointment of counsel can make any difference. The appointment, granted, made it initially more difficult for L.E.S. to advance his constitutional claim *as a pro se party*—given that counsel failed to respond to the county attorney's motion asking the court to retract the earlier appointment. *See supra* ¶ 20 (asserting that "L.E.S. had no right to oppose the motion himself" while he was represented by counsel). But there is no reason to suspect that the initial appointment in any way *inhibited* L.E.S. from making a constitutional claim.[4] From

_____

[3] The majority seeks to limit the exception that it adopts today by asserting that L.E.S.'s lawyer "abdicated all responsibility by failing to make any argument regarding L.E.S.'s right to representation." *Supra* ¶ 21 n.3. But despite the rhetorical flourish, the majority's ultimate conclusion boils down to a failure of preservation on the issue raised on appeal. The "abdicat[ion] of all responsibility" is purely in the failure to raise an issue that the client wishes to raise on appeal. That problem falls in the heartland of the law of preservation. And the usual (and in my view appropriate) response to a failure to preserve is not to excuse it on the ground that it amounts to abdication, but to deem it insufficient as a matter of preservation.

[4] If L.E.S. had actually been precluded from preserving his constitutional claim, *then* we could excuse his lack of preservation. We would do so, however, not under a loose exception to the law of preservation, but under one of its core tenets. The rule of preservation incorporates a principle of reasonableness. A party has a duty to take reasonable efforts to give the district court a chance to correct errors he

(cont.)

wishes to raise on appeal. *State v. Pinder*, 2005 UT 15, ¶ 46, 114 P.3d 551; *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. That principle incorporates a concept of impossibility and a doctrine of futility: A party who cannot legally or practically object is not required to do so, and our courts accordingly excuse a failure to object where doing so would be futile. *State v. Rothlisberger*, 2004 UT App. 226, ¶ 29, 95 P.3d 1193. Yet L.E.S. comes nowhere close to qualifying under these standards. He had every reason and opportunity to preserve his due process claim; he just didn't think to raise it.

The majority bases its determination of "exceptional circumstances" on the fact that "L.E.S. had no technical vehicle" for raising the *Lassiter* issue because he had already been denied appointed counsel and "[m]otions to reconsider are not recognized by the Utah Rules of Civil Procedure." *Supra* ¶ 20 (quoting *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615). But that analysis ignores the agency relationship between a party and his lawyer. "For better or worse, our legal system treats attorneys as agents for their clients. And on that basis we generally deem clients responsible for the decisions they make on advice of counsel." *In re Adoption of J.S.*, 2014 UT 51, ¶ 63, 358 P.3d 1009 *cert. denied sub nom. Bolden v. Doe*, 136 S. Ct. 31 (2015). Thus, L.E.S. *did* have an opportunity to raise a due process right to appointed counsel. The opportunity came to him at a time when he was represented by counsel. And counsel's failure to raise the argument is imputed to L.E.S. He cannot avoid the effect of his lawyer's failure to preserve an issue at trial by identifying a new issue that he was "unable" to raise because his lawyer failed to do so.

The majority's contrary conclusion threatens to swallow the law of preservation. If a party can avoid the effects of a failure of preservation by retaining new counsel on appeal and blaming the lack of preservation on prior counsel, I suspect we will see a lot of new lawyers retained on appeal. Perhaps that will be a boon to appellate specialists. But it will undermine the fairness, efficiency, and reliance concerns protected by our law of preservation. The majority's standard cannot stand. In time we will inevitably be forced to retract it. I would avoid that eventuality by rejecting the majority's approach here.

The majority alludes to unspecified deficiencies in a malpractice claim in these circumstances. *Supra* ¶ 21 n.3. It is undoubtedly true that a malpractice action would not provide an avenue for L.E.S. to restore his parental rights. But our law of preservation has never recognized an exception along these lines—an exception measured by the adequacy of

(cont.)

all that appears, neither L.E.S. nor his lawyer thought to make the argument. And in any event there is no doubt that L.E.S. had the chance to raise a constitutional claim in subsequent proceedings when he was no longer represented by counsel. Again he just failed to do so.

¶ 57 That is why, presumably, the court falls back on the notion that the *Lassiter* framework involves a "sophisticated constitutional argument." *Supra* ¶ 20. Fair enough. But the argument under *Lassiter* is no more complex or "sophisticated" than any of a wide range of constitutional claims we have long deemed subject to the law of preservation. And presumably the court is not adopting a general exception to the law of preservation for pro se parties advancing "sophisticated" constitutional claims.[5] It is only asserting that "these circumstances" are sufficient. *Supra* ¶ 21. But that strikes me as inadequate. If we are unwilling to articulate a general rule, we leave the impression that we are acting lawlessly. And in the absence of any such rule here, I dissent from the invocation of the exceptional circumstances doctrine. Finding nothing in our caselaw to define the contours of any such rule, moreover, I would repudiate this doctrine going forward.

¶ 58 I see no real barrier in our cases to so doing. We have adverted to an "exceptional circumstances" basis for an exception to the law of preservation in a string of past cases. But we have rarely invoked it in a case in which it made any difference. In most cases where we have articulated this exception, in other words, we have either declined to apply it[6] or proceeded to identify an alternative basis for appellate

---

the remedy in a malpractice suit. And this strikes me as an imprudent step—and one we will be required to limit in future cases.

[5] Pro se litigants generally are held "to the same standard of knowledge and practice as any qualified member of the bar." *State v. Winfield*, 2006 UT 4, ¶ 19, 128 P.3d 1171 (citation omitted). Thus, we "accord[] every consideration that may reasonably be indulged" from the arguments that a pro se litigant makes, *id.*, but we do not excuse such a party from the rules of preservation. *Cf. id.* ¶¶ 20–21 (finding invited error and refusing to consider arguments raised on appeal). A contrary rule would create chaos in our appellate system. And I assume the majority is not abandoning this principle. But that only underscores the loose, fact-driven nature of the majority's decision.

[6] *See, e.g., State v. Munguia*, 2011 UT 5, ¶¶ 24–29, 253 P.3d 1082 (concluding that the "exceptional circumstances" exception was not implicated by the facts of the case); *State v. Nelson-Waggoner*, 2004 UT

(cont.)

review (either a determination that the matter was preserved or that review is necessary under the doctrine of plain error).[7]

---

29, ¶¶ 15–16, 23–24, 94 P.3d 186 (same); *In re Schwenke*, 2004 UT 17, ¶ 34 & n.6, 89 P.3d 117 (same); *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994) (same); *Jolivet v. Cook*, 784 P.2d 1148, 1151 (Utah 1989) (same); *State v. Steggell*, 660 P.2d 252, 254 (Utah 1983) (explaining that "[i]n the absence of exceptional circumstances, this [c]ourt has long refused to review matters raised for the first time on appeal," and concluding that "[n]o exceptional circumstances exist in the present case"); *State v. Pierce*, 655 P.2d 676, 677 (Utah 1982) (declining to address unpreserved constitutional issue under the exceptional circumstances exception).

[7] *See, e.g.*, *State v. Low,* 2008 UT 58, ¶¶ 19–49, 192 P.3d 867 (suggesting that "exceptional circumstances" was an established doctrine, but ultimately applying "plain error"); *State v. Dunn*, 850 P.2d 1201, 1209 n.3 (Utah 1993) (recognizing the existence of the "exceptional circumstances" doctrine, but noting that the exception was "ill-defined and applies primarily to rare procedural anomalies," and choosing to "proceed under the better-established plain error exception" (citations omitted)).

Judge Roth of our court of appeals has suggested that the "most prominent cases where Utah courts have found exceptional circumstances and reviewed unpreserved issues are 'where a change in law or the settled interpretation of law color[s] the failure to have raised an issue at trial.'" *State v. Johnson*, 2014 UT App 161, ¶ 34, 330 P.3d 743 (Roth, J., concurring) (alteration in original) (citing *State v. Lopez*, 873 P.2d 1127, 1134 n.2 (Utah 1994); *see also State v. Haston*, 846 P.2d 1276 (Utah 1993) (per curiam)). This may be a wise limitation. But we have never clearly articulated it—and certainly have never limited the exceptional circumstances doctrine to these circumstances. *See Lopez*, 873 P.2d at 1134 n.2 (allowing "independent analysis" on state constitutional standard without deciding whether the issue was adequately preserved; concluding that such briefing was permitted because changes in federal constitutional law explained why the state issue may not have been raised below; but failing to give any content to the exceptional circumstances doctrine); *Haston*, 846 P.2d at 1277 (allowing appellant to assert that his conviction was "for a crime which is not recognized in Utah"; but without mentioning "exceptional circumstances," much less defining it; and concluding that a denial of a right to raise this argument "would deny [the] defendant due process, as guaranteed under our federal and state constitutions"). Ultimately,

(cont.)

¶ 59 In these circumstances I see no *stare decisis* reason to retain the doctrine of exceptional circumstances. That follows from the fact that the doctrine has rarely taken hold as a firm holding of the court, *see State v. Gardiner*, 814 P.2d 568, 572 (Utah 1991) (noting that "this court is not bound by earlier dicta"), and from the unpredictability and unworkability of the doctrine, *see Eldridge v. Johndrow*, 2015 UT 21, ¶ 40, 345 P.3d 553 (noting that "to determine whether a precedent has become firmly established," the court first asks "how well it has worked in practice"). Thus, I would observe the general rule of preservation in this case and limit exceptions to those more firmly rooted in our caselaw (plain error review and claims rooted in ineffective assistance of counsel).

¶ 60 And I would affirm on that basis. L.E.S. cannot possibly establish plain error. The *Lassiter* balancing test, as noted below, is highly fact-intensive and case-specific. It can hardly be plain or obvious that counsel should have been appointed under the *Lassiter* standard, particularly where this court is divided on that same question. This is not an appropriate case for an ineffective assistance of counsel claim, moreover. Under established caselaw, such a claim is limited to the criminal realm, in which a party has a Sixth Amendment right to counsel.[8] This is not such a case, and L.E.S. has no basis for avoiding the law of preservation by advancing a claim for ineffective assistance.

II

¶ 61 Even accepting the majority's "exceptional circumstances" analysis for the sake of argument, I still would affirm. I would do so under the Due Process Clause of the United States Constitution under the standard set forth in *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), which articulates a presumption against the mandatory

---

moreover, a barrier to raising an issue in the district court might well fit within the existing law of preservation (and not need an exception), given that our law requires only reasonable efforts to preserve an issue at trial. *See supra* ¶ 56 n.4.

[8] *See Nelson v. Boeing Co.*, 446 F.3d 1118, 1119 (10th Cir. 2006) ("The general rule in civil cases is that the ineffective assistance of counsel is not a basis for appeal or retrial. If a client's chosen counsel performs below professionally acceptable standards . . . the client's remedy is not reversal, but rather a legal malpractice lawsuit against the deficient attorney." (citation omitted)).

appointment of counsel in a parental-rights termination case. I dissent from the majority's analysis because it seems to me to turn this presumption on its head. This is a simple, straightforward parental-rights termination case, and I would deem it subject to the presumption against the appointment of counsel set forth in *Lassiter*.

¶ 62   That conclusion requires me to reach a question not addressed by the majority—whether L.E.S. has a right to appointed counsel under the Due Process Clause of the Utah Constitution, UTAH CONST. art. I, § 7. To decide that question I would begin with first principles—with the text of the Utah Constitution as understood at the time of its framing. And I would hold that L.E.S. has no right to appointed counsel as a matter of Utah constitutional law because such right would not have been recognized as a component of "due process" in 1896.

A

¶ 63 The controlling due process framework under the United States Constitution is that set forth in the *Lassiter* case. In *Lassiter*, the court reiterated a longstanding "presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom."[9] 452 U.S. at 27. Yet it also left room for an

---

[9] This presumption is a central tenet of the *Lassiter* opinion. The presumption "against the right to appointed counsel" is stated in one form or another at least four times in the court's opinion. *See Lassiter*, 452 U.S. at 26–27 (stating of "the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty," and explaining that "[i]t is against this presumption that all the other elements in the due process decision must be measured"); *id.* at 27 ("We must balance [the *Eldridge* factors] against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom."); *id.* at 31 ("The dispositive question, which must now be addressed, is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status."); *id.* ("If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be

(cont.)

said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel."). With that in mind, I cannot see how the majority can attribute to *Lassiter* the notion "that the presumption against the right to counsel in civil cases has 'generally' been overcome in the parental-rights termination context." *Supra* ¶ 36. It is true that *Lassiter* cited cases that had "held that the State must appoint counsel for indigent parents at termination proceedings." *Id.* at 30. But I do not see how we can interpret *Lassiter* to have endorsed the cited cases, or to suggest that their analysis represents a proper weighing of the *Eldridge* factors. None of the cited cases engages in *Eldridge* balancing. *See Dep't of Pub. Welfare v. J.K.B.*, 393 N.E.2d 406, 407–09 (Mass. 1979) (failing to acknowledge the presumption or the *Eldridge* factors); *State ex rel. Heller v. Miller*, 399 N.E.2d 66, 70 (Ohio 1980) (same); *In re Chad S.*, 580 P.2d 983, 984–86 (Okla. 1978) (same); *see also Danforth v. Maine Dep't of Health and Welfare*, 303 A.2d 794, 795 (Me. 1973) (ruling on appointed counsel issue before *Eldridge* created presumption against it); *In re Friesz*, 208 N.W.2d 259, 260–61 (Neb. 1973) (same); *Crist v. Division of Youth and Family Servs.*, 320 A.2d 203, 209–11 (N.J. 1974) (same); *In re Myricks*, 533 P.2d 841, 842 (Wash. 1975) (same). And the *Lassiter* court does not cite these cases to illustrate the proper weighing of the *Eldridge* factors in the parental termination setting. The cites appear only as a background description of existing practice.

I cannot say whether the *Lassiter* court "lament[ed] . . . th[e] state of affairs" represented by these cases. *Supra* ¶ 37. But it is beyond dispute that its holding dramatically "change[d]" the legal landscape. *Id.* The pre-*Lassiter* cases, just cited, each concluded that due process *always* required the appointment of counsel in parental termination proceedings. *See Danforth*, 303 A.2d at 795 ("We hold that an indigent parent or parents against whom a custody petition is instituted under 22 M.R.S.A. § 3792 is entitled to have counsel appointed at the State's expense unless the right to counsel is knowingly waived."); *J.K.B.*, 393 N.E.2d at 408 ("[I]ndigent parents have a constitutional right to appointed counsel, if they wish, before their parental rights are terminated . . . ." (footnote omitted)); *In re Friesz*, 208 N.W.2d at 260 ("A parent's concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right to be relinquished to the State without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer." (internal citations omitted)); *Crist*, 320 A.2d at 210 ("For the State to

(cont.)

intrude permanently or only temporarily in a manner designed to disassemble the nuclear family, society's most basic human and psychological unit, without affording counsel and guidance to a class of society's least equipped adversaries strikes the court as a fundamental deprivation of procedural due process."); *State ex rel. Heller*, 399 N.E.2d at 70 (holding that "in actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require that indigent parents be provided with counsel and a transcript at public expense for appeals as of right."); *In re Chad S.*, 580 P.2d at 985 ("[T]he full panoply of procedural safeguards must be applied to child deprivation hearings. This includes the right to counsel[.]" (footnote omitted)); *In re Myricks*, 533 P.2d at 842 ("The nature of the rights in question [in a child deprivation proceeding] and the relative powers of the antagonists, necessitate the appointment of counsel").

By contrast, the North Carolina judgment reviewed in *Lassiter* had concluded the opposite—that appointment of counsel was not required by the Due Process Clause. *See Lassiter*, 452 U.S. at 30–31. Indeed, *Lassiter* notes that on the record before it, the North Carolina decision was the only "presently authoritative case" to conclude "that an indigent parent has no due process right to appointed counsel in termination proceedings." *Lassiter*, 452 U.S. at 30–31.

Against this landscape, *Lassiter* affirmed. In so doing, it overruled the nearly uniform consensus of cases reaching the opposite conclusion. *See id.* at 31–34. The court held not only that there is a presumption against the right to appointed counsel—even in parental termination cases— but also that this presumption had not been satisfied in the case before it. *Id.*

The majority's approach in this case cannot be reconciled with the *Lassiter* opinion as a whole. On one hand, the majority claims fidelity to the presumption stated repeatedly in *Lassiter*. *Supra* ¶ 22. On the other hand, it also asserts (incorrectly, by taking a quote from *Lassiter* out of context) that the presumption "has 'generally' been overcome in the parental-rights termination context." *Supra* ¶ 36. The court cannot have it both ways. Either *Lassiter* states a presumption against appointment of counsel or it doesn't. In my view, the entirety of the *Lassiter* opinion speaks unmistakably of a presumption. I see no way to read the citation to pre-*Lassiter* cases as obviating everything else in the court's articulation and application of the law.

(cont.)

exception to this general rule. It held that the factors in *Mathews v. Eldridge*, 424 U.S. 319 (1976)—"the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions"—may weigh "against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." *Lassiter*, 452 U.S. at 27.

¶ 64 The *Lassiter* opinion assessed the relevant *Eldridge* factors as follows: "[T]he parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high." *Id.* at 31. *Lassiter* then set forth the following standard for rebuttal of the above-stated presumption:

> If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed," neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in *Gagnon v. Scarpelli*, and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review.

*Id.* at 31–32 (citations omitted).

¶ 65   The *Lassiter* court applied this standard in a case involving an incarcerated parent whose rights were severed on the basis of her failure to "maintain concern or responsibility for the welfare" of her child, and the determination that termination was in the "best interests of the minor." *Id*. at 24. In rejecting Ms. Lassiter's asserted right to appointment of counsel, the court focused on the nature of the issues in the case and the perceived need for counsel to address them. It noted that there were "no allegations of neglect or abuse upon which criminal charges could be based," *id*. at 32; it observed that "no expert witnesses testified and the case presented no specially troublesome points of law, either procedural or substantive," *id*.; and it concluded that "the weight of the evidence" was "sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference" in the case, *id*. at 32–33.

¶ 66   I view the *Lassiter* opinion as highlighting the importance of the third *Eldridge* factor—the "risk that the procedures used will lead to erroneous decisions." *Id*. at 27. It does so in several ways. First is the court's reiteration of the presumption against the appointment of counsel (in a case in which incarceration is not a risk). The presumption is a core premise of the court's opinion. *See id*. at 26–27 ("[T]he presumption [is] that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured."); *id*. at 27 (the court "must balance [the *Eldridge*] elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom"); *id*. at 31 ("[t]he dispositive question . . . is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption . . . ."). And the presumption must be understood in light of the nature of the three factors from *Eldridge*: For the most part, the private interests and the State's interests are static, so the factor that varies most from case to case is the third—the risk of error in a proceeding in which the parent proceeds without appointed counsel.

¶ 67  The court's opinion underscores that point in the way it describes the three *Eldridge* factors. The discussion of the first two factors is relatively short and straightforward. And the court's description of these factors is mostly static. The court speaks in terms of the State's interests as they will stand in most all cases—in assuring the

"welfare of the child," in securing "an accurate and just decision," and in seeing that the "termination decision [is] made as economically as possible." *Id*. at 27–28. The description of the "private" interests of the indigent parent is similarly static. Of that factor, the court highlights the "commanding" nature of the "parent's interest in the accuracy and justice of the decision to terminate his or her parental status," noting that this interest may be enhanced in a case involving a risk of criminal jeopardy. *Id*. at 27.

¶ 68   The court's discussion of the third factor—the risk of error—is different. Here the analysis is decidedly dynamic and clearly case-dependent. The court observes (citing the State's arguments) that the "subject of a termination hearing"—"the parent's relationship with her child"—may be "one as to which the parent must be uniquely well informed and to which the parent must have given prolonged thought." *Id*. at 29. It also states (again citing the State's arguments) that some termination proceedings are "not likely to produce difficult points of evidentiary law, or even of substantive law, since the evidentiary problems peculiar to criminal trials are not present and since the standards for termination are not complicated." *Id*. On the other hand, the court notes that "the ultimate issues with which a termination hearing deals are not always simple," offering the example of a case in which "[e]xpert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented." *Id*. at 30.

¶ 69 Finally, the court's application of these standards to the relevant facts in *Lassiter* underscores the crucial role of the third factor. In concluding that Ms. Lassiter was not entitled to appointed counsel, the *Lassiter* court cites circumstances rooted extensively in the risk of error analysis—the lack of expert testimony or "troublesome points of law, either procedural or substantive," and the notion that the evidence was sufficiently strong that a lawyer would not likely have made a difference. *See id*. at 32–33.

¶ 70   For these reasons it seems to me that the *Lassiter* standard is highly dependent on the third *Eldridge* factor.[10] Fidelity to the *Lassiter*

---

[10] The point is not to diminish the relevance of "the other two factors" set forth in *Lassiter*. *Supra* ¶ 24 n.6. I agree with the majority that these factors also "play a role." *Supra* ¶ 24 n.6. But the point is that the first two factors are mostly static, and it is principally the third factor that will vary from case to case. So if we are to stay true to the

(cont.)

presumption, and to the above-stated standards, requires us to find a due process right to counsel only in the unusual parental-rights termination case—only in the case (unlike *Lassiter* or this case) in which there are complex legal or evidentiary questions requiring an unusual degree of legal expertise.[11] The calculus may change where there is a risk of criminal jeopardy that supplements the parent's interest; but no such risk is present here.[12]

---

*Lassiter* notion of a presumption against appointment of counsel—denying counsel except in the exceptional case—our analysis must depend most significantly on this last factor.

[11] This is the way that *Lassiter* has been understood in other jurisdictions. *See In re N.A.*, 193 P.3d 1228, 1257 (Haw. Ct. App. 2008) (explaining that "[b]ecause the private interests of the parents and the competing interests of the government are evenly balanced, the court's determination invariably hinges on the third factor"), *abrogated by In re T.M.*, 319 P.3d 338, 355 (ruling that indigent parents are guaranteed appointed counsel under the Hawaii Constitution); *In re Parental Rights as to N.D.O.*, 115 P.3d 223, 226 (Nev. 2005) ("We expect that both the parent's interests and the State's interests will almost invariably be strong in termination proceedings."); *State ex rel. Juvenile Dep't Multnomah Cty. v. Grannis*, 680 P.2d 660, 664 (Or. Ct. App. 1984) (noting that under *Lassiter*, "the nature of the parental interest and of the governmental interest are relatively constant and, generally, the only variable for the court to consider in deciding whether to appoint counsel is the extent of the 'risk that the procedures used will lead to erroneous decisions'"); *S.C. Dep't of Soc. Servs. v. Vanderhorst*, 340 S.E.2d 149, 152–53 (S.C. 1986) (applying *Lassiter* but only analyzing the "risk of error" prong); *State ex rel. T.H. v. Min*, 802 S.W.2d 625, 626–27 (Tenn. Ct. App. 1990) (holding that the interests of parents and the state in a termination-of-parental-rights proceeding are "evenly balanced" and that the risk-of-error prong was thus the "main consideration"); *but see* 340 S.E.2d at 153 ("[W]e caution that under our interpretation of *Lassiter* cases in which appointment of counsel is not required should be the exception.").

[12] Under *Lassiter*, this concern is implicated where the risk of criminal jeopardy is "inherent" in the proceedings. *See Lassiter*, 452 U.S. at 31. That is not at all the case here. At most there is a speculative risk associated with vague charges of neglect, emotional abuse, and failure to pay child support. Even the majority concedes that that is

(cont.)

¶ 71 I would affirm because I find no such a basis for appointment of counsel here. From all that appears from the record, this is a garden-variety parental termination case in which the key issue concerns the "the parent's relationship with her child"[13]—a matter on which the parent is "uniquely well informed and to which the parent must have given prolonged thought." *Id.* at 29. L.E.S. has identified no "troublesome points of law," no difficult evidentiary issues, and no expert testimony that he was required to address. Nor has he identified *any evidence* he would have presented—or opposing evidence he would have rebutted more effectively—if he had been appointed a lawyer. And these failures are fatal.[14] Absent any arguments along these lines, I see no basis for a rebuttal of the presumption in *Lassiter*.

---

insufficient. *See supra* ¶ 26 n.8 (speculating that "there might . . . be some danger of criminal liability based on allegations in the petition to terminate L.E.S.'s rights," but conceding that it is "not clear" that any such danger is implicated here).

[13] In this case, as in *Lassiter*, the basis for termination was a straightforward one—the assertion that the parent made "less than token efforts" to communicate with the child. And that is one of those grounds on which parents are "uniquely well informed." *Lassiter*, 452 U.S. at 29–30. That will not always be the case. Our code identifies more legally complicated grounds. *See* UTAH CODE § 78A-6-507 (setting forth grounds for termination, including factually and legally complex grounds such as "the parent is unfit or incompetent").

[14] A principal basis for the termination of L.E.S.'s rights was parallel to the basis in *Lassiter*—the failure to communicate with the child for a significant period of time. Here there was undisputed evidence on that point. And as in *Lassiter,* the "weight of the evidence" on this point "was sufficiently great that the presence of counsel . . . could not have made a determinative difference." *See Lassiter*, 452 U.S. at 32–33. At least L.E.S. has made no effort to show that it would have made a difference. And that is fatal under *Lassiter*.

It is not enough to say that L.E.S., unlike the parent in *Lassiter*, "has clearly shown interest in his child." *Supra* ¶ 35 n.10. Showing an interest is insufficient under Utah law. To satisfy Utah law, L.E.S. was required to "communicate" with his child. *See* UTAH CODE § 78A-6-507(1)(f)(i). The undisputed evidence at trial showed that L.E.S. had failed to fulfill this requirement. And no evidence presented on appeal suggests that "the presence of counsel . . . could . . . have made a

(cont.)

¶ 72   The majority opinion acknowledges the *Lassiter* presumption. *Supra* ¶ 22. And it cites no significant legal or evidentiary complexities of this case—no expert testimony at issue and no difficult question of legal analysis—that heightened the risk of error. Indeed the court concedes that there was "no expert medical or psychiatric testimony or other similarly complicated evidence [] brought before the court" and acknowledges "the apparent simplicity of the record." *Supra* ¶ 34. Yet the court nonetheless speculates that "it is possible" that such complications *could* be introduced into the case—that if L.E.S. had "been represented by counsel, such [expert] testimony may have been brought" and the "simple and uncomplicated" case presented could well have been less so. *Supra* ¶ 34. Thus, the court says that "the apparent simplicity of the record may be due to the fact that L.E.S. represented himself pro se and had no opportunity to present more complicated evidence and argument with the aid of counsel." *Supra* ¶34. On that basis, the majority "conclude[s] that the risks of error in this case were significant," and sufficient to rebut the presumption against appointment of counsel. *Supra* ¶ 34.

¶ 73 This analysis is unfaithful to *Lassiter*. By engaging a counterfactual hypothetical instead of analysis of the actual case presented, the court effectively inverts the *Lassiter* presumption. If the hypothetical *possibility* that a lawyer could transform a straightforward case into a complicated one is enough, then most any indigent parent will be entitled to counsel. That can most always be said.[15] In future

determinative difference" on this issue. L.E.S. has not identified evidence that he communicated with his child that was not presented due to missteps of counsel. That is fatal regardless of L.E.S.'s supposed "interest" in his child.

[15] The court claims to identify two unique features of this case that contribute to the perceived risk of error—the fact that L.E.S. was temporarily given counsel before he lost it and the fact that L.E.S. was incarcerated. *Supra* ¶¶ 31–32. But neither of these considerations meaningfully affects the complexity of the proceeding or the risk of error. Nothing in the record—or even in simple logic—supports the notion that having a lawyer for a brief period of time would make things worse than never having one at all. And the fact of incarceration clearly cannot be enough. Ms. Lassiter was incarcerated, but the court nonetheless concluded that there was an insufficient risk of error to justify appointment of counsel. *Lassiter*, 452 U.S at 20. And so this fact cannot in and of itself be determinative—unless we mean to flip the

(cont.)

cases, a Utah parent seeking appointed counsel will not bear the burden set forth in *Lassiter*; he need only cite paragraph 33 of today's opinion—noting the hypothetical possibility that a lawyer *could* turn a "simple and uncomplicated" case into a complex one, and concluding that that renders the risk of error "significant" enough to justify counsel's appointment.[16] And if that is enough—as it apparently is under today's majority opinion—then we have flipped the *Lassiter* presumption.[17]

---

presumption set forth in *Lassiter* (a move we lack the authority to make).

[16] In the usual case the argument will be even easier than it is here. At the outset of a proceeding the exact contours of a case will be unknown. And at that stage the savvy parent will always be able to assert a potential for complexity (and thus for a risk of error).

[17] I agree with the majority that the task before us is to "faithfully apply *Lassiter* to the facts of each case," not to make an "empirical" prediction as to the "pattern of outcomes" in the run of the cases. *Supra* ¶ 36. And contrary to the majority's characterization, my analysis makes no empirical claim that a proper application of the presumption in *Lassiter* will result in appointment of counsel only rarely. My point is not to object to any "outcomes" that may follow from our decision in this case. It is to observe that if the majority's framework will require the appointment of counsel in even the most simple, straightforward case, then we have reason to question the fidelity of that framework to the standard set forth in *Lassiter*.

This case is a simple and straightforward one. The court's authority to terminate L.E.S.'s rights turned on whether he made "only token efforts . . . to support or communicate with the child." UTAH CODE § 78A-6-507(1)(f)(i). It is difficult to envision a legal issue in the termination of parental rights context that could be more straightforward and accessible than this one. It is equally difficult to identify a subject matter over which a parent would have greater knowledge. If, as the majority holds, the *Lassiter* presumption is overcome in this case, it is hard to conceive of a parental-termination case in which the presumption would not be overcome. And if appointed counsel is effectively required in *every* parental-termination case under the majority's framework, then we have circumvented the *Lassiter* presumption while still paying homage to it. The predicted "pattern of outcomes," in other words, is troubling not because the

(cont.)

¶ 74 Fidelity to *Lassiter* demands that we affirm the district court's decision not to appoint counsel for L.E.S. The majority's analysis of the significance of the parent's interest in maintaining a relationship with his child, *supra* ¶¶ 25–26, and the State's interests (a weak pecuniary interest in opposing appointment, and a shared interest in protecting the child and assuring a just outcome), *supra* ¶¶ 27–28, is insufficient. These points are broadly applicable premises that will hold in most any case. And such considerations cannot suffice to rebut the *Lassiter* presumption unless we are effectively inverting it.

---

*outcomes* are objectionable, but because the revealed *pattern* suggests that we have not in fact "faithfully appl[ied] *Lassiter*." *Supra* ¶ 36. Perhaps there is circular comfort in insisting that "whatever pattern of outcomes emerges . . . is the pattern of outcomes required by the law." *Supra* ¶ 36. But *Lassiter* prescribes a presumption against the appointment of counsel in parental termination cases. So if the majority's approach demands appointment in the run of the mill case, we have reason to question the compatibility of that approach with "the law" as stated in *Lassiter*.

The majority insists that "even if" appointment of counsel will be required in many cases, such a result stems not from our application of the *Lassiter* test but "from the existence of a statutory right to counsel under Utah Code section 78A-6-1111(1)(c)." *Supra* ¶ 38 n.11. But the *statutory* right to counsel in state-initiated proceedings tells us nothing about the existence of a *constitutional* right to counsel in privately filed cases. The majority's contrary conclusion confuses the due process inquiry by importing elements of L.E.S.'s equal protection claim— which the court purports to avoid. *See supra* ¶ 22 n.4. L.E.S.'s due process right to counsel under *Lassiter* is not at all affected by the legislature's decision to afford counsel in state-initiated cases. And regardless of whether the case was filed by the state or by a private party, the question is whether the *Lassiter* factors weigh in favor of a right to appointed counsel. In any event, when determining whether a constitutional right to counsel exists, I see no reason to conclude that the *Lassiter* test would result in the denial of counsel in a large number of state-initiated cases, as the majority suggests. *Supra* ¶ 38 n.11. In those cases, as with privately initiated cases, the key question would be the complexity and difficulty of the case. And counsel would be required as a matter of due process only in cases in which counsel is necessary to avoid a substantial risk of error.

¶ 75 The court claims to find two unique features of this case in its analysis of the "private interest" and "government interest" factors. On the former the majority speculates that there may be "some concern regarding the risk of self-incrimination in this case" given that "the district court found that L.E.S. should have taken K.A.S.'s mother to court for refusing to facilitate visits but that he did not do so because 'he was afraid because he was on drugs,'" and "the district court also noted that L.E.S.'s 'extensive substance abuse is terms of neglect." *Supra* ¶ 26. But this is a concern of the court's own imagining. L.E.S. failed to raise it in his briefs on this appeal, and the adoptive parents have therefore not been heard on the matter. And in any event a vague allusion to past drug use does not prove that there was a tangible risk of self-incrimination. I would not so conclude here—certainly not without adversary briefing on the matter.

¶ 76 As to the second *Eldridge* factor, the court asserts that "the State's interest in terminating L.E.S.'s parental rights was . . . less urgent in this case than it was in *Lassiter*[] because this parental-rights termination proceeding was initiated and advanced by a private party rather than by the State." *Supra* ¶ 28. But I do not see how that follows. Any and all termination proceedings implicate the State's power and the State's interest in protecting the safety and welfare of the child. *See supra* ¶ 28 (acknowledging that "the State is necessarily involved in the termination of parental rights since only the State can terminate a parent's rights to his or her child"). I see nothing in the record or in our law to support the court's premise that the State's interest is diminished in a case initiated by a private party. Certainly the interests of the child are the same regardless of who initiates the case. And the parent's interests are likewise unaltered. Where our law authorizes private parties to sue to initiate a parental-rights termination case, we should presume that such a case is advancing governmental policy.

¶ 77 Finally, on the third factor, the court claims that the risk of error is more significant in a proceeding initiated by a private party because "L.E.S. has not enjoyed the additional protections provided in state-initiated termination cases." *Supra* ¶ 31. But this is the wrong baseline. Under *Lassiter* the question is not whether we can identify other cases in which the risk of error is diminished (due to "additional protections" afforded by statute or otherwise). It is whether the risk of error is unreasonably "significant" as that inquiry is framed in the *Lassiter* opinion.

¶ 78 The *Lassiter* court framed the inquiry by reference to North Carolina procedures available to the parent in that case. *Lassiter*, 452

U.S. at 28–29 (describing the procedures North Carolina established to "assure accurate decisions" in termination proceedings). And it found the risk of error insufficient to sustain the conclusion that counsel was necessary as a matter of due process. *Id.* at 32–33. That should be dispositive here. L.E.S. faced no greater risk than that faced by the parent in *Lassiter*. The Utah procedures afforded to L.E.S. are parallel to those available under North Carolina law in *Lassiter*. *Compare Lassiter*, 452 U.S at 28–29, *with* UTAH CODE §§ 78A-6-503 to -507. And, as stated above, L.E.S. has identified no "troublesome points of law," no difficult evidentiary issues, and no expert testimony that he was required to address.

¶ 79 For these reasons I view the *Lassiter* presumption as controlling here. I see no basis for a rebuttal of that presumption in this case. And I dissent from the majority's contrary conclusion, which seems to me to invert the presumption announced by the court.

B

¶ 80 The controlling due process framework under the Utah Constitution has not been established in our caselaw.[18] To resolve L.E.S.'s state constitutional claim, I would accordingly begin with first principles—with the text of the Utah Due Process Clause, and with the meaning of those terms at the time of the framing of our Utah Constitution.[19] I would examine the "plain meaning" of the text of the Utah Constitution in light of "historic experience" and the

---

[18] In our past cases, we have adverted to claims under the Due Process Clause of the Utah Constitution. *See In re Adoption of J.S.*, 2014 UT 51, ¶ 42, 358 P.3d 1009, *cert. denied sub nom. Bolden v. Doe*, 136 S. Ct. 31 (2015); *State v. Munguia*, 2011 UT 5, ¶¶ 15–18, 253 P.3d 1082; *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 204 (Utah 1984); *Untermyer v. State Tax Comm'n*, 129 P.2d 881, 885 (Utah 1942). But there is no established standard for state due process that differs from the standard(s) articulated by the U.S. Supreme Court under the United States Constitution. *See In re Adoption of J.S.*, 2014 UT ¶ 57 (repudiating the formerly heightened state due process standard articulated in *Wells*, 681 P.2d 199). I would address the state due process question here because I conclude that L.E.S.'s federal claim falls short.

[19] *State v. Houston*, 2015 UT 40, ¶¶ 148–57, 353 P.3d 55 (Lee, A.C.J., concurring) (making the case for originalist interpretation of the Utah Constitution and rebutting critiques of this methodology).

"presuppositions of those who employed them," keeping in mind "Utah's particular traditions at the time of drafting." *American Bush v. City of S. Salt Lake*, 2006 UT 40, ¶¶ 10, 12 140 P.3d 1235.

¶ 81   L.E.S. purports to advance an originalist basis for his state due process claim. He cites late nineteenth-century history in support of the notion that our Utah founders valued parenthood and family unity highly, so much so that they embraced a religious belief that family bonds continue beyond this world. L.E.S. notes, in particular, the history of anti-polygamy raids in Utah, emphasizing the length to which our Utah founders went to protect their legal relationships with their children, and positing that they would have found parental-rights termination proceedings problematic. From that premise, L.E.S. posits that the framers of the Utah Constitution would have been in favor of appointment of counsel in a parental-rights termination proceeding. And he urges us to read one into the Utah Due Process Clause on this basis.

¶ 82   The cited history is interesting. And a party should always be commended for seeking to tie his constitutional analysis to the original meaning of the text.[20] Here, however, L.E.S.'s history falls short because

---

[20] Too often the briefing on a novel question of constitutional law takes the form of a pure policy argument. A typical argument on an issue of state constitutional law would take the following form: (a) the Utah Supreme Court is not bound to follow the U.S. Supreme Court's construction of similar or analogous provisions of the United States Constitution in our interpretation of the Utah Constitution, (b) federal precedent is inadequate because it fails to advance some particular policy concern of importance to the claimant, and (c) *therefore*, this court should embrace an expansionist view of state constitutional law that advances the claimant's policy concern. A few of our precedents even seem to encourage this type of analysis. *See, e.g., Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1993) ("We have encouraged parties briefing state constitutional issues to use historical and textual evidence, sister state law, *and policy arguments* in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question." (emphasis added)). But the conclusion can hardly follow from the premise. In interpreting the constitution, we must be *interpreting the constitution*—and not just vindicating policy concerns that we deem important. *Houston*, 2015 UT ¶¶ 154–57 (Lee, A.C.J., concurring) (noting that the court must construe constitutional terms "as originally understood" and that "[a]

(cont.)

it is at far too high a level of generality. L.E.S. hasn't presented anything of relevance to the founding-era meaning of "due process." He has simply asserted that families were important to the generation that framed the Utah Constitution. That is undoubtedly true. But it tells us little or nothing about how far they were inclined to go in protecting families ties, and even less about whether they thought their inclinations were enshrined in the constitutional guarantee of "due process."

¶ 83 To answer that question, we must look to the historical understanding of the principle of due *process*. And we must ask whether that principle encompasses a right to a lawyer appointed and paid for by the State. The answer to that question is no. I would reject L.E.S.'s state constitutional claim because it finds no support in the 1890s-era understanding of "due process" and because it is undermined by the proceedings of the Utah constitutional convention.

1

¶ 84 Historically, the guarantee of "due process of law" was understood as a legal term of art encompassing long-established principles associated with "the law of the land." EDWARD COKE, THE SECOND PART OF THE INSTITUTIONS OF THE LAWS OF ENGLAND 46, 50 (3d ed. 1669). This is the understanding of "due process" that prevailed in the U.S. Supreme Court throughout the nineteenth century. A classic statement is set forth in *Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272 (1855): "The words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Charta." Id*. at 276 (citation omitted).[21]

¶ 85 The "law of the land" was widely understood to encompass three basic guarantees: "(1) it rendered the King's power subject to 'law'; (2) it guaranteed the barons a right to participate in decisions

---

constitution rooted in 'evolving standards' arising out of a judge's 'humanitarian instincts' is no constitution at all"). To do so we must examine the text of the operative document and begin with its original meaning.

[21] *See* William D. Guthric, *Constitutionality of the Sherman Anti-Trust Act of 1890*, 11 HARV. L. REV. 80, 84 (1897) (noting that the "historic term, 'due process of law,' or its equivalent, 'the law of the land,'" has shielded people from oppression and embodied "the foremost of our liberties" for centuries).

which affected them; and (3) it assured equal treatment" under law.[22] Thus, the guarantee of "due process" served as "a restraint on the legislative as well as on the executive and judicial powers of the government." *Murray*, 59 U.S. at 276. But the restraint on legislative power operated to prevent rather than require deviations from traditional notions of due process.

¶ 86 In *Murray*, the United States Supreme Court laid out a historical test for determining whether a certain procedure satisfied "due process of law." *Id.* at 277. First, the court should "examine the constitution itself" and see if the procedure directly conflicts with any of its provisions. *Id.* If not, the court should then "look to those settled usages and modes of proceeding existing in the common and statute law of England" as well as "the legislation of the colonies and provinces, and more especially of the States." *Id.* at 277–78. If a procedure was consistent with the practice of the common law and with "the laws of many of the [s]tates at the time of the adoption of this amendment" then it "cannot be denied to be due process of law." *Id.* at 280.

¶ 87 In later cases, the United States Supreme Court elaborated upon this test. It explained that while a historical pedigree was sufficient condition for the "due process of law," the Constitution did not forbid innovative procedures that were not rooted in the common law tradition. The court noted that that would "deny every quality of the law but its age, and . . . render it incapable of progress or improvement." *Hurtado v. California*, 110 U.S. 516, 529 (1884). Yet the court continued to reiterate that a practice rooted in historical tradition would survive due process scrutiny. It held that "any legal proceeding enforced by public authority . . . which regards and preserves these principles of liberty and justice, must be held to be due process of law." *Id.* at 537. And it noted that the Due Process Clause thus "refers to certain fundamental rights which [our] system of jurisprudence . . . has always recognized." *Id.* at 536 (citing *Brown v. Bd. of Levee Comm'rs*, 50 Miss. 468, 480 (1874) (emphasizing the requirements of jurisdiction, notice, and process as integral to due process of law)).

¶ 88 The United States Supreme Court identified certain "principles of liberty and justice" that are integral to due process and are generally guaranteed as tenets of due process: "regular allegations,

---

[22] Jane Rutherford, *The Myth of Due Process*, 72 B.U. L. REV. 1, 9 (1992) (footnotes omitted).

opportunity to answer, and a trial according to some settled course of judicial proceedings." *Murray*, 59 U.S. at 280; *see also Wilkinson v. Leland*, 27 U.S. 627, 657 (1829) (forbidding the exercise of eminent domain power "without trial, without notice, and without offence"). With the exception of certain summary procedures where these demands may not apply, such guarantees form the core protections of the Due Process Clause. *See Murray*, 59 U.S. at 280.

¶ 89 State due process provisions were interpreted in a similar fashion. In decisions throughout the eighteenth and nineteenth centuries, state supreme courts interpreted their state due process clauses to preserve a similar set of principles. The Tennessee Supreme Court, for example, interpreted that state's due process provision as a guarantee that all laws were "equally binding upon every member of the community," and not just available to certain favored groups. *Sheppard v. Johnson*, 21 Tenn. 285, 296 (1841); *see also State v. Stimpson*, 62 A. 14, 18 (Vt. 1905); *Eden v. People*, 43 N.E. 1108, 1109 (Ill. 1896). Other state supreme courts likewise embraced such a "law of the land" notion of due process.[23] In other states, the courts extended the due process principle to protect against the infringement of certain fundamental tenets of due process, such as the right to a trial, *Zylstra v. Corp. of Charleston*, I S.C.L. (I Bay) 382 (1794), and a nonarbitrary procedure of

---

[23] *See Wynehamer v. People*, 13 N.Y. 378, 426 (1856) (characterizing the guarantee of due process as "law in its regular administration through courts of justice" (citation omitted)); *Harbison v. Knoxville Iron Co.*, 53 S.W. 955, 957 (Tenn. 1899) ("What, then, is 'due process of law,' or 'the law of the land'? The two phrases have exactly the same import, and that which is entitled to recognition as the one is to be recognized as the other also."), *aff'd*, 183 U.S. 13 (1901); *Rowan v. State*, 30 Wis. 129, 148 (1872) ("due process" and "law of the land" mean the same thing). This was also the understanding of "due process" that prevailed at the time of the ratification of the Fourteenth Amendment. *See* Cong. Globe, 37th Cong., 2d. Sess. 345–49 (1862) (statement of Rep. Bingham, a sponsor of the amendment) (pointing to existing caselaw on the subject and explaining that due process of law was a synonym for the phrase "law of the land"); *see also* Akhil Reed Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 YALE L.J. 1193, 1225 (1992) (discussing Bingham's remarks and the prevailing understanding of the phrase "due process" at the time of the ratification of the Fourteenth Amendment).

adjudication under their state due process clauses, *Vanzant v. Waddel*, 10 Tenn. (2 Yer.) 260 (1829).

¶ 90   Thus, the prevailing understanding of the Due Process Clause through the eighteenth and nineteenth centuries can generally be summarized as follows: Procedures which were consistent with the common law and historical tradition were presumptively permissible, while new procedures were permissible so long as they did not deny one of the core protections of due process, such as a right to notice and a meaningful opportunity to be heard.[24]

2

¶ 91   The historical understanding of "due process"—the view that prevailed at the time of the framing of the Utah Constitution—cannot be deemed to encompass a right to a lawyer paid for by the government. Nor can this principle be understood to yield to courts the power to prescribe evolving standards of constitutional "fairness" based on an assessment of the costs and benefits of innovations in procedure.

¶ 92   We possess the power to assure fair procedure—and to do so by weighing costs and benefits. "But our usual course for so doing is by promulgating rules of procedure." *In re Steffensen*, 2016 UT 18, ¶ 7, 373 P.3d 186. Thus, the Due Process Clause does not impose upon us "a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall." *Id.* ¶ 7 n.2 (quoting *Ownbey v. Morgan*, 256 U.S. 94, 110–11 (1921)). "[T]he Due Process Clause is not a free-wheeling constitutional license for courts to assure fairness on a case-by-case basis." *Id.* ¶ 7. It is a historically driven test "measured by reference to 'traditional notions of fair play and substantial justice'" *Id.* (citing *ClearOne v. Revolabs*, 2016 UT 16, ¶ 8, 369 P.3d 1269).

¶ 93   I would interpret the Utah Due Process Clause in accordance with the historical understanding set forth above. And I would accordingly reject L.E.S.'s claim to a constitutional right to appointed counsel.

¶ 94   L.E.S. has identified no historical basis for a due process right to a lawyer paid for by the state. The procedures afforded him accord with historical due process: He was given notice and a meaningful

---

[24] *See generally* Andrew T. Hyman, *The Little Word "Due"*, 38 AKRON L. REV. 1 (2005).

opportunity to be heard, and the procedures available to him were in line with those secured historically. Because L.E.S. is seeking a novel advancement in procedure, his recourse is elsewhere—in a proposal for legislative reform, for example—and not in a state constitutional claim.

¶ 95  I am aware of no historical evidence supporting the right to paid counsel. At the time of our Utah founding, a number of states had begun to provide for appointment of counsel in criminal cases.[25] But none extended this right beyond the criminal context.[26] And in the criminal realm, the right secured by the states was a legislative innovation, not a judicial one. And no one thought that such a right was inherent in the constitutional guarantee of due process.[27]

¶ 96  This held in Utah around the time of our founding. Our 1898 code provided for appointed counsel for indigent defendants in criminal cases, *see* UTAH REVISED STATUTORY CODE OF 1898, § 4767, but nowhere in our law was there a right to appointed counsel in a civil setting. And of course there was no indication in the early years of our state that anyone thought that "due process" guaranteed a lawyer paid for by the state (in a criminal case or otherwise).

¶ 97  The debates in our Utah constitutional convention support this conclusion. A relevant part of the debate took place on March 23, 1898. On that date, the question arose as to whether the article 1 section 12 right not to be "compelled to advance money or fees to secure the rights herein guaranteed" also guaranteed a right to paid counsel. 1

---

[25] *See Betts v. Brady*, 316 U.S. 455, 470 n.26 (1942) (citing state statutes of twelve states providing for appointed counsel for capital cases or cases of felony or other grave crime in the 1800s).

[26] *See generally* John MacArthur Maguire, *Poverty and Civil Litigation*, 36 HARV. L. REV. 361, 388 (1923) (noting that as of the 1920s only a dozen states "g[a]ve their courts power to assign lawyers to needy suitors" and twenty states had no *in forma pauperis* provisions for the poor at all). And in those states that had provisions for the appointment of an attorney for indigent parties in civil suits, payment frequently was not guaranteed. *See Bd. of Comm'rs of Howard Cty. v. Pollard*, 55 N.E. 87, 87 (Ind. 1899). So those appointed could refuse by arguing that such an appointment would be an unconstitutional commandeering of services. *See Blythe v. State*, 4 Ind. 525, 525 (1853).

[27] *See Betts*, 316 U.S. at 470–71 (observing that "the matter has generally been deemed one of legislative policy").

PROCEEDINGS IN THE CONSTITUTIONAL CONVENTION OF 1898, at 308 (proceeding of March 23, 1898). Mr. Eldredge asked Mr. Evans (of Weber) what would happen to the "the poor fellow that has no money." *Id.* Evans responded that "[t]hat is usually provided by the legislature" and that "[i]t is a very unusual thing in constitutions, but a very usual thing in the statutory laws." *Id.* That is significant. And no one raised a parallel question regarding the article 1 section 11 right in "any civil cause to which he is a party" to "prosecut[e] or defend[] before any tribunal in this State, by himself or counsel." *See* UTAH CONST. of 1896 art. I, § 11.

¶ 98 For these reasons, I see no basis for finding a state constitutional right to appointed counsel in a case like this one. Due process is not a charter for "free-wheeling authority for the courts to second-guess the wisdom or fairness of legislative policy judgments." *In re Adoption of B.Y.*, 2015 UT 67, ¶ 27, 356 P.3d 1215 (citation omitted). It is an assurance of a right to traditional, longstanding tenets of due process, such as a "reasonable notice and an opportunity to be heard." *Id.* ¶ 16. I would reject L.E.S.'s claim because he cites no such basis for a right to appointed counsel.

### III

¶ 99 When a novel question of constitutional law presents itself, it is tempting to treat the question as an invitation to vindicate our gut-level sense of "justice," or in other words our sense of good policy. That temptation is heightened when the matter at hand is as sensitive and difficult as the one at issue here—of appointment of counsel in a parental-rights termination case. I can understand the impulse to find a basis for such an appointment. But I find no such basis in constitutional law. And in the absence of such a basis, I would leave the matter to the legislature.

¶ 100 That is the branch of government with the power and experience necessary to decide on the wisdom of allocating public money to support appointment of counsel. And it is the branch of government that has direct accountability to the people. Perhaps in time the legislature will decide that paid counsel should be appointed in a case like this one. Unless and until that happens, I would not find a legal right to appointed counsel in parental-termination cases.